STATE v. FRANK S. RAWLAND.

199 N. W. 2d 774.

June 30, 1972—No. 42444.

*C. Paul Jones*, State Public Defender, and *John Broeker*, Assistant State Public Defender, for appellant.

*Warren Spannaus*, Attorney General, *John E. MacGibbon*, County Attorney, and *Robert B. Danforth*, Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Otis, Kelly, and Gunn, JJ., and considered en banc.

WILLIAM D. GUNN, JUSTICE.*

### The Factual Background

Defendant, Frank Rawland, appeals from a conviction, following trial without a jury, of murder in the third degree. Following conviction, he was sentenced to an indeterminate term of up to 25 years in the State Prison.

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

Defendant was originally charged with murder in the second degree and entered a plea of not guilty by reason of insanity. In this appeal, defendant contends that the trial court improperly found him to be sane within the test for criminal responsibility set forth in Minn. St. 1969, § 611.026.

Defendant was convicted of causing his father's death by stabbing him with a butcher knife on the evening of December 17, 1968. At the time that the lethal attack took place, the defendant, then age 37, was living in the basement apartment of his parents' home in St. Cloud. He was living there at that time under a visiting-status release from the United States Veterans Administration Hospital (VA Hospital) in St. Cloud, where he had been placed earlier in 1968 by the probate court of Stearns County under commitment as a mentally ill person.

Defendant's commitment in 1968 was preceded by a number of significant events. Defendant had been mentally ill for a period of time that predated his first commitment in 1965 by a number of years. During more recent years, he has suffered from mental delusions and has been hospitalized for counseling and drug therapy. Defendant first began counseling for an abnormal mental condition in 1963 when he experienced a depression compounded by frustration.

During the summer of 1965, defendant was employed as a public school teacher in Port Huron, Michigan. He became convinced that the John Birch Society wished to assassinate him. In an effort to escape the plot he believed it had concocted against him, he drove to the Canadian border to seek "political and social asylum." He was refused admittance by Canadian border officials, so he went to the bank of a river separating the United States and Canada and swam across the river where he was apprehended by Canadian police and turned over to a local sheriff in the United States.

Defendant was released 2 days later and went to the home of his brother in Fargo, North Dakota. Defendant continued to fear that there was a plot against his life, so he hitchhiked back to

St. Cloud. Upon his arrival in St. Cloud, he was apprehended and committed, at his father's request, to the VA Hospital, where he remained from September 1965 to March 1966, when he was discharged on a trial basis.

Following his release, he obtained a full-time civil service job and a part-time one as an apartment-house caretaker in St. Paul and attended the William Mitchell College of Law for a semester. Defendant manifested mental abnormalities again in January 1968. He became suspicious that his landlady was "pulling tricks" on him and entered her apartment, armed with a loaded pistol, and ordered her to call the police so that he could "find out what was going on around the building." When the police arrived, defendant was arrested and confined first in jail and then in St. Paul Ramsey Hospital. He was then recommitted to the VA Hospital in St. Cloud.

Defendant was released from the VA Hospital in May 1968 and returned to his parents' home. Then, in June, he went to Denver, Colorado, where he stayed for the summer writing short stories and essays on mental illness and on current American politics. In Denver, defendant again experienced difficulties. He had an auto accident while under the influence of alcohol, and he again began to suspect that a large-scale plot existed to take his life.

In October 1968, defendant again returned to his parents' home in St. Cloud. His delusions during the following months became increasingly vivid and frequent. He became convinced that by some unexplained mechanism he could transmit messages to the world by speaking into his AM radio. On at least two such occasions he announced his candidacy for the presidency of the United States by this means. After each speech he was disappointed when he rode his bicycle into downtown St. Cloud expecting to be greeted by crowds of well-wishers. These presidential aspirations created a continued fear of assassination in December 1968.

At that time he began to suspect his parents were part of the

plot against his life. He refused to eat vitamin pills given to him by his mother for fear they contained poison, and he believed his parents were equipped to spy on him with electronic devices.

Prior to defendant's return to St. Cloud in the fall of 1968, his father had taken possession of two shotguns and a rifle belonging to the defendant. Defendant had purchased a third shotgun and placed it in the clothes closet of his room. Unknown to the defendant, his father had also removed this gun prior to the evening of December 17, 1968.

The facts concerning the manner in which the defendant inflicted the wound that caused his father's death are not seriously disputed. The evidence shows that on the evening of December 17, 1968, the defendant was in the basement apartment of his parents' home. His father, Dr. Perry Rawland, who was a professor at St. Cloud State College, and his mother were on the main floor of their home. At about 9 p. m. that evening, Perry Rawland and his wife decided to take a walk outdoors. While Mrs. Rawland was changing into warmer clothing in the bedroom, her husband decided to call a colleague on the telephone to discuss recent disturbances on campus. This conversation lasted for 15 or 20 minutes and during its course, Perry Rawland made several statements, such as, "What are you going to do to stop him?" These statements were made with reference to campus events, none of which related to his son, Frank Rawland.

Meanwhile, Frank Rawland had also decided to go for a walk. He discovered that his gun was missing when he went to get clothing from the closet. He became disturbed by the thought that his father had once more deprived him of a gun. The evidence indicates he felt this was a deliberate attempt on his father's part to render him defenseless against those who were plotting to take his life. He rushed up the stairway to inflict some form of harm upon his father. As he rushed up the stairs, he overheard his father state, over the telephone, "He will have to be stopped." Although this remark in reality referred to an individual on the campus, the defendant felt it referred to him.

When he reached the top of the stairway, he went to the kitchen a few feet away, grabbed a butcher knife, and plunged it into his father's back, causing injuries that resulted in death the following day.

Upon hearing the disturbance, defendant's mother rushed to the kitchen where she saw defendant and her husband. Defendant told her to get medical aid for his father. Defendant appeared to be shocked and agitated at that time, but he waited in his home for the arrival of police and submitted to arrest without a struggle.

### The Medical Background

Psychological and psychiatric testimony was received at the trial, explaining defendant's mental condition, both before and at the moment he attacked his father. Four experts were called and their testimony indicates that they all agreed that defendant suffered from paranoid schizophrenia. They also were in general agreement that he has suffered from this illness for a number of years and that illness affected his judgment on the evening he killed his father.

The first to testify was Dr. Paul L. Dunstan, a psychiatrist for the West Central Mental Health Center in Willmar, Minnesota. Dr. Dunstan examined defendant prior to trial at the joint request of the prosecution and defense. Dr. Dunstan made a differential diagnosis of defendant's condition that included sociopathic personality, paranoid schizophrenia, and pseudopsychopathic schizophrenia. Of those three diagnoses, he felt that paranoid schizophrenia most accurately describes defendant's mental condition. As basis for this opinion, Dr. Dunstan pointed to the fact that defendant's record at the VA Hospital is permeated with evidence of delusional material, indicating the existence of a severe thinking disorder. Dr. Dunstan also testified that defendant's personality development as a whole showed a good deal of emotional immaturity and impulsivity which could in some degree cause him to suspend his judgment about his

reaction to events about him. In addition, Dr. Dunstan indicated that defendant's records show that he has a long history of resentment toward other members of his family, but especially toward his father whom he viewed as a rejecting sort of person and in essence saw as an obstruction of some kind to his manhood or his development of personality and individuality.

Dr. Dunstan stated that although defendant has periods of remission, periods when no symptoms are evident, he was definitely suffering from the symptoms of his mental illness at the time he killed his father.

Based on his observations and findings with regard to the defendant's mental condition, Dr. Dunstan offered the following opinion with regard to defendant's ability to distinguish right from wrong at the time he stabbed his father (Defendant's exhibit 17, p. 7):

"* * * I *assume* that 'right and wrong' refers to the legal edict that prohibits bodily assault on another person. I think that Mr. Rawland knew the difference between right and wrong, i. e. he knew it was unlawful to assault his father. *However,* (1) I believe that Mr. Rawland has the attitude that the law does not necessarily apply to him—i. e. that he is a special person with special rights and (2) even though he knew the difference between right and wrong, I believe that he could not have avoided striking his father at the moment he did because he was at the mercy of his rage, which effectively prevented him from reflecting on his actions or taking into consideration the consequences of his behavior."

Dr. Dunstan further amplified those thoughts by indicating that defendant had his own value system of right and wrong within which he quite possibly would have determined the attack upon his father to be "right" had he reflected upon his action. Dr. Dunstan stated that the catalyst or provoking factor for the attack was the discovery of the missing gun in combination with the conversation that defendant overheard his father carrying

on with a colleague, and that defendant at the time never stopped to reflect whether his action was right or wrong.[1]

Dr. Dunstan's findings and conclusions were substantially concurred in by Dr. Phillip Mehmel, a clinical psychologist from Willmar, Minnesota.

Dr. Manning E. Van Nostrand, a professor of psychology at St. Cloud State College, counseled defendant intermittently from

---

[1] In his testimony Dr. Dunstan made the following statements:

"Q.   May I inquire whether mental illness, in your judgment, caused in some degree him to suspend his judgment of right and wrong and, as you say, beyond stopping himself to fly into this action?

"A.   Well, the mental illness, yes, that is the inner personality configuration and the development now, his personality development as a whole which showed a good deal of emotional immaturity, impulsivity and a tendency to act impulsively; I think to that extent, yes."

"Q.   Now, we're attempting to get at how you used the nature of the terms 'right and wrong' when you feel that he did know the difference between right and wrong.

"A.   Well, I used there simply that he knew that it was legally wrong to attack another person physically."

"A.   I think that he did not actually pause to reflect on this matter."

"A.   * * * [B]ut I don't think that at the moment he was running up that flight of steps that he was considering whether it was right or wrong."

"THE COURT:   Do you have an opinion, Doctor, on how that mental illness that he suffered on the date of this act, December 17, 1968,—do you have an opinion on how that mental illness affected his control threshold, if it did, in any way?

"THE WITNESS:   Yes.

"THE COURT:   You do have an opinion?

"THE WITNESS:   Yes.

"THE COURT:   What is your opinion, Doctor?

"THE WITNESS:   Well, if I understand this correctly, his general state of mind was abnormal, that is, he thought that he was going to be president, and he had carried with him various types of delusion from the past and these fragments were probably there. I think that these—that this mental environment so to speak would operate in the direction of lowering his threshold of control and his ability to appreciate things about him adequately."

1963 to the date of the trial. He testified that defendant's paranoid schizophrenia predated the fatal attack on his father by a number of years and that although defendant does have periods of remission, he was in a state of mental illness on December 17, 1968.

Dr. Van Nostrand testified that defendant had throughout his life perceived his father as a frustrating person in his environment, an obstacle to his growing to maturity. He also testified that defendant's normal reaction to frustration was withdrawal or escape. Three notable examples of this were his attempted flight to Canada, his periodic drinking habits, and his idea of being a presidential candidate on a third party ticket. Thus, over the years, through a complex mixture of fantasy and reality, defendant would seek escape. Dr. Van Nostrand testified that defendant's mental condition steadily deteriorated between October and December 1968 so that on the evening of December 17 these mental characteristics in combination with defendant's impulsive tendencies caused him to inflict the deadly blow upon his father. Dr. Van Nostrand explained this conclusion by stating that defendant often found escape by returning home to his mother and father. But when he found his father had rendered him defenseless in his last sanctuary of escape, his home, defendant felt so threatened that he impulsively reacted in self-defense by striking out at "them"—at all of his fantasied enemies who were at that moment within his delusional mind embodied in the person of his father. Thus, while in reality he attacked his father, in his fantasy he attacked no one, but rather merely defended himself. Unfortunately, the "enemy" appeared to be in the person of his father at that particular moment.

For these reasons Dr. Van Nostrand testified that the defendant did not at the moment he attacked his father know his act was wrong.[2]

---

[2] In his testimony Dr. Van Nostrand said:

"Q. Would you have an opinion as to whether his mental illness affected his judgment and his conduct?

Dr. Robert May, chief of psychiatry of the VA Hospital at St. Cloud, testified that defendant was mentally ill and was suffering from paranoid schizophrenia at the time of the incident. Dr. May stated he thought the incident was a function of defendant's continual development of a delusional system, finding release in the act of stabbing his father. The tension of his delusional system, in other words, so overwhelmed defendant that he was

---

"A. Yes, it did, I think. These are my opinions."

"Q. * * * In your opinion, now, was he able to distinguish right from wrong at this instance?

"A. In an ethical sense you asked the question and the answer very simply is no, he was not able to, in my opinion."

"Q. We have all over-simplified it?

"A. I think we have talked about rage, only, and anger, only. I think there is a great area of threat, there is a great area where Frank needs a feeling of defense either by running or by defending. There is fear.

"Q. You're suggesting he was defending himself against his father at this point?

"A. Not against his father, no.

"Q. Against whom?

"A. Against the—against 'them' in the fantasy world of his perception of the situation."

"Q. Now, getting back to the act of this stabbing, you said, I believe, that Frank did not know right from wrong in an ethical sense at the time that he did this particular act, am I saying that approximately correct?

"A. Yes, that's what I said.

"Q. In an ethical sense, what is connoted by your use of the word 'ethical sense'?

"A. In the normative evaluational sense of what our society expects is right and wrong.

"Q. Does it also embody the legal sense?

"A. Yes. In my opinion—I'm not a lawyer, but, in my opinion, the law does—it does attempt to codify the ethical and moral relationships of a society.

"Q. It's your opinion that at that precise moment he did not know this difference?

"A. Yes, that's my opinion."

unable to control his impulsive violence. In describing defendant's paranoid schizophrenia, Dr. May testified:

"We have to remember that the individual responds the same way you and I do so that the defect is one of perception. He perceives the world around him as a hostile threatening world which now has closed in around him and is virtually ready to annihilate him, and just as you and I might strike out, all out, if we felt we were being threatened to the point of death or annihilation, so does your schizophrenic, but he is doing it on the basis of his misconceptions of what is going on around him."

Dr. May went on to state that an individual with defendant's mental condition develops a delusional system in which he may become trapped, or cornered, or threatened with some overwhelming, frequently nameless, disaster, to which his only defense is either to flee or fight—normal reactions to such a situation—and if the ill individual reaches a point where flight is no longer possible, then he may attack. This whole attack is, of course, based on a delusion rather than the reality of the situation as a more normal person would interpret it. The result of such a delusional situation is an assault over which the individual truly has no control. For those reasons, Dr. May concluded that defendant's actions on the evening of December 17, 1968, occurred in a situation where he was unable to stop and pass judgment on his conduct. He testified that essentially defendant was so deeply involved in his delusions that he had developed his own sense of what was right and wrong, or what actions were appropriate, in a given situation. This state of mind left him unable to reflect upon the moral, ethical, or legal implications of his actions on the evening he killed his father.[3]

---

[3] In his testimony, Dr. May said:

"Q. What is that opinion?

"A. That Frank was mentally ill at the time of the stabbing."

"A. * * * and if the individual gets to the point where flight no longer is possible, then, he may attack and this whole attack, you see,

### The Issues

The issues raised by defendant are: (1) Whether he was so mentally ill when he stabbed his father that he should have been absolved of criminal responsibility (a) because the test for criminal responsibility as set out in Minn. St. 1969, § 611.026, is invalid under the Eighth and Fourteenth Amendments to the United States Constitution, or (b) because, if the statute is valid, the evidence was such that defendant under a fair application of the statute should have been found not guilty; and (2) whether the state proved the requisites of third-degree murder.

The case was tried to the court without a jury. No findings of fact, memorandum, or oral statement for the record accompanied the decision. There was no jury to instruct, and we are deprived of a guide as to the construction of the statute that brought the factfinder to his conclusion.

---

is based on a delusion, it is not based on reality as you and I see it around us. So, you have to say that certainly at the moment of the stabbing, here is this individual who is impulsive and acting out, who was threatened, he was misinterpreting the things that were going on around him and interpreting them as having an ominous meaning for himself, and again and again, as we have seen a paranoid schizophrenic in this trap, the result has been an assault over which truly they have no control."

"Q. And, at that moment or occasion would you say, then, that the ethical sense is suspended?

"A. The individual is at the point where he no longer asks himself is this right or is this wrong. He is in grave danger, danger of destruction, and at that moment I'm quite sure there is no asking of any questions of one's self."

"Q. Are you assuming that because there was an assaultive attack that all of these things must have come together, Doctor?

"A. Apparently enough came together to, 'make Frank take leave of his senses' because he had gone these 37 plus years, as somebody mentioned yesterday, without any overt assaultive attack on his father, and, yet, murder itself is the ultimate assaultive attack, and you and I see no logical progression in Frank's life leading to the death of his father. This is the psychotic reaction."

## The Legal Background

### Generally

There is no question but that defendant struck the blow that resulted in his father's death. The only substantial issue in the case was whether the defendant should have been found not guilty because of mental illness or, as the applicable Minnesota statute then provided, because of "idiocy, imbecility, lunacy, or insanity." The statute, Minn. St. 1969, § 611.026, then read: [4]

"No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

The statute is a legislative codification of the common-law M'Naghten rule. In what at first impression appears to be simple and direct language, it attempts to restate the answers given by judges to questions propounded by the English House of Lords in 1843. Daniel M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718.

The judges were reluctant to answer the questions which related to the legal responsibility of mentally ill or mentally deficient persons. The uncertainty, controversy, and confusion that have resulted from judicial attempts to apply the rule in specific cases, both in England and this country, establish that, even if they did not make good law, the judges in M'Naghten were good prophets. [5]

---

[4] The statutory language has since been amended by substitution of the words "mentally ill or mentally deficient" for "idiocy, imbecility, lunacy, or insanity." L. 1971, c. 352, § 1. For purposes of this appeal, the change has no significance.

[5] Mr. Justice Maule said: "* * * Thirdly, from a fear of which I cannot divest myself, that as these questions relate to matters of criminal

The judges stated the test of mental responsibility to be whether the accused was acting under such a defect of reason, from mental defect, as not to know the nature and quality of his act; or, if he did know it, he did not know that what he was doing was wrong. For a more complete discussion of the M'Naghten rule and its adoption in Minnesota, see, State v. Scott, 41 Minn. 365, 43 N. W. 62 (1889); State v. Finn, 257 Minn. 138, 100 N. W. 2d 508 (1960); and comment by the Advisory Committee on Revision of the Criminal Law appearing in Proposed Minnesota Criminal Code, p. 32 (1962).

Following the answers of the judges in M'Naghten, the rule stated was applied in England until its modification in recent years. It was adopted in this country by most states either through judicial decision or statutory enactment, with New Hampshire a notable early exception. Federal courts at first applied the rule, but in recent years most Federal circuits have either abandoned it or adopted significant modifications or supplements, such as the irresistible impulse test. For an instruc-

---

law of great importance and frequent occurrence, the answers to them by the Judges may embarrass the administration of justice, when they are cited in criminal trials." 8 Eng. Rep. 720.

Lord Chief Justice Tindal said: "My Lords, Her Majesty's Judges (with the exception of Mr. Justice Maule, who has stated his opinion to your Lordships), in answering the questions proposed to them by your Lordships' House, think it right, in the first place, to state that they have forborne entering into any particular discussion upon these questions, from the extreme and almost insuperable difficulty of applying those answers to cases in which the facts are not brought judicially before them. The facts of each particular case must of necessity present themselves with endless variety, and with every shade of difference in each case; and as it is their duty to declare the law upon each particular case, on facts proved before them, and after hearing argument of counsel thereon, they deem it at once impracticable, and at the same time dangerous to the administration of justice, if it were practicable, to attempt to make minute applications of the principles involved in the answers given by them to your Lordships' questions." 8 Eng. Rep. 722.

tive annotation covering the history of the rule up to 1954, see 45 A. L. R. 2d 1447. For a summary of the approaches of the several Federal Courts of Appeal on the issue of criminal responsibility, see Pope v. United States, 372 F. 2d 710, 737 (8 Cir. 1967).

The M'Naghten test for criminal responsibility has been defended, supported, condemned, and reviled. The seemingly simple concept has led to more verbiage in judicial decisions and law review articles than have most legal concepts. It is not our purpose here to review or attempt criticism of those pronouncements except to say it appears that the courts and legal and psychiatric writers have become so entangled in legal profundities and psychiatric jargon that they may have been prevented from seeing and giving verbal expression to the real issue. The plethora of judicial pronouncements, sometimes impossible to reconcile and often difficult to comprehend, have at times lent confusion rather than light to a problem that cries out for a sensible, pragmatic, and comprehensible solution.

Judge (now Supreme Court Justice) Blackmun in speaking for the full court of the Eighth Circuit in Pope v. United States, 372 F. 2d 710, 735 (1967), gave better expression to similar views when he said:

"* * * We still entertain a deep suspicion that, despite the welter of legal, psychiatric, and philosophic theory and verbiage, much of the legal problem is basically semantic and engulfed in words, and that a practical American jury in any given case (except, possibly, upon the McDonald-Durham approach), will reach the same conclusion, whether it be instructed along traditional M'Naghten and irresistible impulse lines, or upon any of the approaches of *Currens* or *Freeman* or variations thereof. Perhaps, as Judge Brown has suggested in dissent, 'we should quit talking in terms of *McNaghten, Davis, Durham, Howard, Parsons,* or the rest'. * * *

* * * * *

"We hold again, and we stress by repetition, that if the trial court freely admits all evidence which appears to be relevant and *if the charge appropriately embraces and requires positive conclusions by the jury as to the defendant's cognition, his volition, and his capacity to control his behavior, and if these three elements of knowledge, will and choice are emphasized in the charge as essential and critical constituents of legal sanity, we shall usually regard the charge as legally sufficient.* And we also repeat what we said in *Feguer,* at p. 245 of 302 F. 2d, and in the second *Dusky,* at p. 759 of 295 F. 2d, namely, that we think this approach is sound because it preserves and builds upon those elements of *M'Naghten* and of lack of control which are acceptable in the present day, and yet modernizes them in terms which the jury can grasp and intelligently apply."

In 21 Am. Jur. 2d, Criminal Law, § 31, the following statements appear:

"An insane person is not capable of committing crime. Thus, a person cannot be legally punished for an act committed while insane, although the same act would constitute a crime if done by a sane person. The defense of insanity is available to all defendants in all criminal trials. And it is a complete defense, not a mitigating circumstance.

"The underlying theory behind the insanity defense has been said to be that a crime requires the joint operation of act and intent. An insane person cannot legally be guilty of any criminal intent. It has even been said that he cannot, in a legal sense, have any intent. If he is incapable of criminal intent, then he is not in law responsible, since one of the essential ingredients of the crime is necessarily missing. Another way of putting the matter stresses moral guilt, rather than intent. It has been said that the basic postulate of our criminal law is a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong. The insane man is not punishable because he is outside the postulate of the law of punishment.

"A statute providing that insanity shall be no defense to a criminal charge would be unconstitutional as a violation of due process of law and of the right to trial by jury. However, it has been held that the test of criminal responsibility is for the legislature and is not a question of constitutional law, state or federal."

The statements in the text are supported by citation of respectable authority.

There has developed in this country a number of tests either to supplement or replace the M'Naghten rule. Some of them are:

(a) The New Hampshire rule, State v. Pike, 49 N. H. 399, 6 Am. R. 533 (1869), to the effect that a defendant is not to be convicted if he was suffering from a mental disease at the time of the criminal act and the act was the offspring or product of the mental disease. For discussion of the New Hampshire rule and its comparison with others, particularly Durham, see Reid, *The Working of the New Hampshire Doctrine of Criminal Insanity,* 15 Miami U. L. Rev. 14, and a similar article by the author in 69 Yale L. Rev. 367.

(b) The Durham rule, Durham v. United States, 94 App. D. C. 228, 241, 214 F. 2d 862, 874, 45 A. L. R. 2d 1430, 1445 (1954), which is not unlike the New Hampshire rule, to the effect "that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

(c) The test proposed by the American Law Institute (model Penal Code, Proposed Official Draft, 1962, § 4.01):

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) * *, * [T]he terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

(d) The Currens test, which modified the American Law Institute test by limiting inquiry to determining whether the defendant, as a result of mental disease or defect, "lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." United States v. Currens, 290 F. 2d 751, 774 (3 Cir. 1961).

(e) The irresistible impulse test, often superimposed upon M'Naghten, and accepted in a number of Federal courts and in some states. See, 21 Am. Jur. 2d, Criminal Law, § 36; Pope v. United States, *supra.*

(f) A number of variations of the M'Naghten rule which have been adopted in various states and Federal jurisdictions. See, for example, State v. White, 58 N. Mex. 324, 330, 270 P. 2d 727, 730 (1954); State v. Shoffner, 31 Wis. 2d 412, 143 N. W. 2d 458 (1966); State v. White, 93 Idaho 153, 456 P. 2d 797 (1969); People v. Martin, 386 Mich. 407, 192 N. W. 2d 215 (1971); Pope v. United States, *supra.*

From our review of the authorities, we have a strong impression that all courts and most textbook and law review writers are seeking the same answer to the same problem. This problem is: What rule, consistent with personal responsibility and constitutional limitations, can, with justice, fairness, and concern for the public interest, be applied so that mentally ill persons are not found guilty of crimes which they did not at the time have the legal capacity to commit?

*In Minnesota*

In Minnesota, and in this case, the problem, paradoxically, is both simplified and complicated—simplified because if, as we have previously held, this court is bound by the statute, Minn. St. 1969, § 611.026, we cannot apply some of the solutions attempted in other jurisdictions, but complicated because, as we have indicated, the M'Naghten test is not the simple one indicated by a cursory examination of the statute and, also, because a strict and literal application of the statute raises problems not

only of justice and fairness but also of the constitutionality of the statute.

Minnesota adopted the M'Naghten rule before it adopted the statute. State v. Gut, 13 Minn. 315 (341) (1868). The first comprehensive discussion of the problem after the statute was enacted is found in State v. Scott, 41 Minn. 365, 43 N. W. 62 (1889), where this court held that the irresistible impulse test could not be superimposed upon M'Naghten. We said (41 Minn. 372, 43 N. W. 64):

"* * * The language of the statute is plain and unambiguous, and it prescribes the *only* grounds upon which the defence of insanity is allowed."

Attempts to add the irresistible impulse test were also rejected in State v. Finn, 257 Minn. 138, 100 N. W. 2d 508 (1960), and State v. Simenson, 195 Minn. 258, 262 N. W. 638 (1935). In Finn, we said the statute "simply does not require judicial construction." 257 Minn. 144, 100 N. W. 2d 513. This was quoted with apparent approval in State v. Eubanks, 277 Minn. 257, 264, 152 N. W. 2d 453, 458 (1967), certiorari denied, 390 U. S. 964, 88 S. Ct. 1070, 19 L. ed. 2d 1165 (1968). See, also, State v. Mytych, 292 Minn. 248, 194 N. W. 2d 276 (1972); State v. Hoskins, 292 Minn. 111, 193 N. W. 2d 802 (1972); State v. King, 286 Minn. 392, 176 N. W. 2d 279 (1970); State v. Dhaemers, 276 Minn. 332, 150 N. W. 2d 61 (1967).

In the Dhaemers case, we said (276 Minn. 339, 150 N. W. 2d 66):

"While we agree that the M'Naghten rule should have been discarded with the horse and buggy, it is part of our statutory law and as such, as long as we adhere to the rule that the legislature can prescribe rules of evidence, we must adhere to the statute. State v. Finn, 257 Minn. 138, 100 N. W. (2d) 508. It would be better if the statute were repealed so that the courts could develop rules for determining mental competency more in

harmony with advances made in this scientific field since the announcement of the M'Naghten rule in 1843."

In Anderson v. Grasberg, 247 Minn. 538, 78 N. W. 2d 450 (1956), we rejected the M'Naghten rule in its application to civil cases.

Except for our review and rejection of the irresistible impulse test, it appears that we have assumed, because the statute seemed clear and unambiguous, that there is no room for construction. Perhaps this was because of the factual background with which prior cases reached this court. The factual background accompanying this appeal requires us to reconsider and reassess that position. It now seems that the statute is not so simple as we had assumed.

While we have criticized the M'Naghten rule, not all of its defenders have contended for the strict and literal application of the rule that appears to have been approved in our previous decisions.

*Other Constructions of M'Naghten*

In Blocker v. United States, 107 App. D. C. 63, 73, 274 F. 2d 572, 582 (1959), Judge Miller, dissenting from a decision based upon the Durham test and advocating return to the right-and-wrong (M'Naghten) test, said:

"The right-wrong and 'irresistible impulse' tests are criteria of causative insanity, that is, not only of insanity, but of causation as well. They are indeed the only true tests of causation. *As I have heretofore suggested, it seems to me that one who knows right from wrong, but freely and deliberately chooses to do the wrong, cannot be heard to say that some mental disease or defect caused his criminal conduct.* This is true even if the defendant's mentality actually deviates from the normal to the extent that psychiatrists say he has a mental disease or even insanity itself, so long as there is no causation." (Italics supplied.)

In an article entitled *The Virtues of M'Naghten,* 51 Minn. L.

Rev. 789, 808, the authors, Joseph M. Livermore and Paul E. Meehl, state:

"* * * The defendant will be excused if at the time of the criminal act he had a mental disease or defect which included among its symptoms or consequences an impairment in one or more of the psychological functions requisite for reasoning (*i.e.*, cognitive ego functions [perceiving, remembering, classifying, judging, etc.]) which, in turn, reduced the strength of his disposition to token 'this is wrong' to a negligibly low value and, as a result, he did not in fact token 'this is wrong' though, if the impairment of reasoning had not been present, the probability of his so tokening would have been materially greater."

See, also, Annotation, 45 A. L. R. 2d 1447.[6] Note, too, the statement in 21 Am. Jur. 2d, Criminal Law, § 31, quoted above: "It has been said that the basic postulate of our criminal law is a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong."

We now question whether the strict and literal construction of the statute indicated by our previous opinions is consistent with the objectives of the judges in M'Naghten, the intent of our own legislature, basic principles of criminal law, or constitutional requirements.

---

[6] In editorial comment in 45 A. L. R. 2d 1450, the writer states: "So long as the law continues its present focus upon the question of moral guilt, it seems that a test of criminal responsibility must continue to be the capacity to form a criminal intent, and the phraseology of 'right and wrong' embodied in the M'Naghten rules seems to be as effective a means of formulating this test as is available.

\* \* \* \* \*

"The procedure adopted in New Hampshire and in the Durham Case seems to be effective in removing the shackles which have often bound the expert in his attempts to inform the court. The questions whether it is equally effective in informing the jury of the issue for decision, or whether it in effect abandons any attempt to pose the issue as a legal question, and leaves it almost exclusively a medical problem for the experts, can only be answered in the light of future experience."

It has been said that a statute providing that insanity shall be no defense would be unconstitutional as a violation of due process of law and the right to trial by jury. Ingles v. People, 92 Colo. 518, 22 P. 2d 1109 (1933); Sinclair v. State, 161 Miss. 142, 132 So. 581 (1931); State v. Strasburg, 60 Wash. 106, 110 P. 1020 (1910); 21 Am. Jur. 2d, Criminal Law, § 31. Our statute as construed in the past and as it has been applied in this case is subject to some of the constitutional objections referred to in concurring opinions of the judges in Sinclair v. State, *supra*.

Citing Powell v. Texas, 392 U. S. 514, 88 S. Ct. 2145, 20 L. ed. 2d 1254 (1968); Robinson v. California, 370 U. S. 660, 82 S. Ct. 1417, 8 L. ed. 2d 758 (1962); and other authorities, defendant has presented a persuasive argument that our statute as construed in prior decisions and applied by the trial judge in this case violates the Eighth and Fourteenth Amendments. Many of our prior decisions have established that if a statute can reasonably be given two constructions, one which would render it valid and one which would render it invalid, it is our duty to accept the first alternative and construe the statute so as to obviate constitutional objections. 17B Dunnell, Dig. (3 ed.) § 8931, and cases cited.

This brings us to the specific issues raised by defendant on this appeal.

### The Decision on Constitutionality

■ As indicated, the statute, strictly and literally construed, may be subject to constitutional objections. The question has been presented here on other occasions. We have consistently upheld the validity of the statute. See the Minnesota cases heretofore cited. In its last expression on the subject in 1952, the United States Supreme Court in Leland v. Oregon, 343 U. S. 790, 72 S. Ct. 1002, 96 L. ed. 1302, with Justices Frankfurter and Black dissenting, refused to hold that the Oregon version of the M'Naghten rule violated the Fourteenth Amendment to the United States Constitution. It indicated that it could not, upon

the basis of then-existing scientific knowledge, find that the rule was unconstitutional.

As we construe the Minnesota statute, § 611.026, and apply it in this case, we do not find constitutional invalidity.

### The Decision on Construction and Application of the Statute in this Case

■ In considering the legal questions presented by defendant's argument that under the evidence and a fair application of the statute he should have been found not guilty by reason of insanity, we do not ignore questions of public policy that are involved.

If we adopt a construction of the statute which liberalizes its application, we should not be insensitive to the policy question presented. This is an area where philosophical views are sometimes in sharp conflict.

A view sometimes expressed is that a literal application of the statute, which in a specific case may result in imprisonment instead of hospitalization of one who has committed an offense, is desirable and in the public interest. The argument advanced is that an individual hospitalized under the statutory commitment for mental illness is often given an early release and without supervision is then free to engage in other illegal activity.

If this defendant had been found not guilty because of insanity, Minn. St. 1969, § 631.19, sets forth the procedure that would have been followed.[7] It is noted that the statute imposed on medi-

---

[7] Minn. St. 1969, § 631.19, provided in part: "When, during the trial of any person on an indictment or information, such person shall be found to have been, at the date of the offense alleged in the indictment, insane, an idiot, or an imbecile and is acquitted on that ground, the jury or the court, as the case may be, shall so state in the verdict, or upon the minutes, and the court shall thereupon, forthwith, commit such person to the proper state hospital or asylum for safe-keeping and treatment; and when, in the opinion of such jury or court, such person, at such date, had homicidal tendencies, the same shall also be stated in the verdict or upon the minutes, and the court shall thereupon, forthwith, commit such person to the Minnesota Security Hospital for safe-

cal authority the awesome responsibility, in homicide cases and others, of certifying that the defendant is "wholly recovered and that no person will be endangered by his discharge" before the committed individual can be released.[8]

No such burden is placed on parole authorities after mentally ill persons are imprisoned for violation of criminal law, and there is no opportunity for judicial intervention. Criminal offenders are regularly being released long before the expiration of the term imposed for the offense committed. In either situation, some errors will inevitably be made. But when mental illness is the cause of an illegal act, it is better that the question of release be left to competent medical and psychiatric authorities, subject in appropriate cases to judicial supervision as provided by our statute, rather than to people not expert in the field of mental illness. Psychiatry is a developing profession. Psychiatrists may not know all the correct answers to the variety of problems presented to them, but they, along with clinical psychologists, are members of the professions that our society has entrusted with the evaluation and treatment of the mentally disturbed and the mentally ill. Indeed, this is the procedure which the legislature, charged with determining questions of policy, has prescribed.

---

keeping and treatment; and in either case such person shall be received and cared for at such hospital or asylum to which he is thus committed.

"The person so acquitted shall be liberated from such hospital or asylum upon the order of the court committing him thereto, when there is presented to the court the certificate, in writing, of the superintendent of the hospital or asylum where such person is confined, certifying that in the opinion of such superintendent such person is wholly recovered and that no person will be endangered by his discharge."

[8] We note that § 631.19 was amended by L. 1971, c. 352, § 3. The amended statute provides for a certification that the person is improved sufficiently to be released and that no person will be endangered by his release and that "[a]fter receiving the recommendation contained in the certificate, if the court determines that such person has improved sufficiently to be released and that no person will be endangered by his discharge, the court shall order his release."

In this case evidence was quite freely received. This has simplified our task. As we examine § 611.026, we find that it establishes a test for a finding of not guilty by reason of insanity. It does not attempt to limit the judicial function of determining what evidence is appropriate for consideration by the factfinder in searching for the answer to the question presented. This case presents a fair situation for application of the rule stated in Northern States Power Co. v. Esperson, 274 Minn. 451, 456, 144 N. W. 2d 372, 376 (1966).

"It is generally understood that courts have the power to establish rules of evidence. 1 Wigmore, Evidence (3 ed.) § 7 (1964 Supp.)."

In considering the question of the application of our statute embodying M'Naghten to the facts in this case, certain factors stand out. There is the fact of the extended period of mental illness described in the factual background. This is not a case where a defendant is feigning insanity to escape the consequences of an illegal act. The illness was of such a nature that defendant on occasion was so out of touch with reality that he must have acted without knowing whether the act was right or wrong. Examples are: His flight to Canada; his riding his bicycle to downtown St. Cloud to meet the throngs he expected to greet him as a presidential candidate; his pointing the loaded gun at his landlady in St. Paul; and his broadcast over the radio to a waiting world.

But, of course, here we are concerned with defendant's mental condition at one specific time. In considering this, the following seem significant:

(a) All experts agreed he had a serious mental disease and that this condition existed at the time of the event.

(b) All experts agreed that he did not have the ability to control his actions at the moment the offense was committed.

(c) All experts inferred that in application of the right-and-

wrong test he was not at the time able to distinguish between right and wrong on an ethical basis.[9]

(d)   There was specific testimony from the one expert who had the most contact with defendant over the years, before and after the event, that he was not able to distinguish right from wrong when the offense occurred.

(e)   All experts agreed that he lacked the capacity to freely and deliberately choose to commit the act.

We have referred to Pope v. United States, *supra*, where the court indicated that if the elements of cognition, volition, and capacity to control behavior are taken into account, there is an adequate basis for a factfinder's decision in a case such as this. Our statute, literally construed, seems to consider cognition only. Although, by reason of our previous rejection of the irresistible impulse test, it may be argued that we should not take into account "capacity to control behavior," we are not foreclosed by previous decisions from considering whether or not volition or will is an element in the defense authorized by the statute. By the very nature of criminal law and the nature of our statute, volition is an element which almost necessarily must be considered if the statutory defense is to have any substance when applied to many cases, and certainly to this one. This is so because if, as in this case, a defendant might realize in a general way that it is illegal to strike a blow with a knife, but if he did not know that the act was ethically wrong, if he did not "freely and deliberately" choose to commit the act, and if he did not have the will to prevent the act, there is missing an ingredient that has almost universally been considered essential before a crime can be committed. As indicated above, a basic postulate of our criminal law is a free agent confronted with the choice between doing right and doing wrong and choosing freely to do the wrong. In Carter

---

[9] Dr. Dunstan, as we have pointed out, thought defendant had the ability to distinguish between right and wrong in a legal sense; but, as we have also indicated, Dr. Dunstan definitely limited the effect of this ability at the moment the act occurred.

v. United States, 102 App. D. C. 227, 235, 252 F. 2d 608, 616 (1957), the court said:

"A bit of underlying philosophy and history is helpful. A common-law crime consists of an act and a vicious mind prompting the act. The common-law axiom was '*Actus non facit reum, nisi mens sit rea.*' The basic import of the criminal law is punishment for a vicious will which motivates a criminal act. To understand the defense of insanity one must keep constantly and clearly in mind the basic postulate of our criminal law—in the words of Dean Pound, quoted by Justice Jackson in Morissette, 'a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.' If a man is '*amens (id est) sine mente*' in respect to an act to such an extent that in doing the act he is not a free agent, or not making a choice, or unknowing of the difference between right and wrong, or not choosing freely, or not acting freely, he is outside the postulate of the law of punishment."

Nor, although we have rejected the irresistible impulse test, does it seem that we should necessarily be deprived of all consideration of capacity to control behavior. The two are not synonomous. All experts agreed that at the moment of the offense this defendant had no such capacity.

Our apparent insistence in the past on a strict, literal, and limited application of the statutory right-and-wrong test has resulted in a construction so narrow that basic principles and concepts of criminal law may have been ignored. This, coupled with our requirement that defendant has the burden of proof on the issue of insanity (a minority approach), has created a situation whereby our statute so applied is of doubtful constitutionality.

We do not believe such a result is required. The statute is open to a reasonable construction.

A basis for finding that construction or interpretation of the statute is permissible now when perhaps it was not in the past is the fact that Minn. St. 1961, § 610.09, providing that a "mor-

bid propensity" to commit crime was not a defense, was eliminated in the Criminal Code of 1963. This change is significant for two reasons. First, the legislature must have had some reason for believing that this language was unnecessary. While several interpretations of its intent are possible, it is clear that the elimination of the statute relating to morbid propensity removes a significant obstacle to the interpretation of § 611.026 as it presently exists. Secondly, the elimination of the morbid propensity provision is significant because it eliminates one of the primary reasons why this court refused to interpret the M'Naghten rule in any other than in its strictest sense. See, State v. Finn, 257 Minn. 138, 100 N. W. 2d 508 (1960); State v. Simenson, 195 Minn. 258, 262 N. W. 638 (1935); State v. Scott, 41 Minn. 365, 43 N. W. 62 (1889). See, also, Snouffer, *The Myth of M'Naghten*, 50 Ore. L. Rev. 41, 55.

It is not unreasonable to hold that when our statute says that a defendant shall not be excused from criminal liability except upon proof that at the time of committing the act he was laboring under such a defect of reason "as not to know the nature of the act or that it was wrong," that this means not only a defendant who knows right from wrong but also one who is competent to make the choice. *Although it does not use the terms competency or capacity, the statute speaks of laboring under such a defect of reason as not to know the nature of his act or that it was wrong. Upon analysis, we find little distinction.* Nor is it unreasonable to hold that in passing upon the statutory test the elements of volition and capacity to control behavior, as well as cognition, be considered by the factfinder.

We agree with Mr. Justice Blackmun's assessment in Pope v. United States, 372 F. 2d 710, 736:

"We think further that this approach does, indeed, take account of the entire man and his mind as a whole; that it enables the jury to consider all the relevant symptomatology; that it avoids undue compartmentalization of the intellect; that it appropriately recognizes the possibility of gradations in capacity;

that it avoids too rigid classification; and that it embraces terms which are comprehensible to a lay jury and which enable it adequately to perform its historical function in the criminal case."

We also agree with the Supreme Court of Michigan when it said in People v. Martin, 386 Mich. 407, 422, 192 N. W. 2d 215, 223:

"It should never be forgotten that it is the jury (or the judge if a jury is waived) who is the ultimate trier of the fact of criminal insanity. In most cases, the expert knowledge of psychiatrists can be of assistance to the jury or judge in arriving at their determination, but under our system of justice that ultimate determination rests with the court or a defendant's jury of his peers."

We are not acting in conflict with, nor departing from, the language of the statute. We are not abdicating the judicial function or the factfinding process inherent in the judicial function. We are requiring consideration of basic criminal law in the attempt to ascertain what the statute means and the manner in which it should be applied. We are broadening the scope of the factfinding process so that the factfinder may have more information upon which to base decision.

In Annotation, 45 A. L. R. 2d 1447, 1450, the editor states that a test of criminal responsibility, in most cases at least, should be the capacity to form a criminal intent. The right-and-wrong test of M'Naghten and our statute, properly construed, may be as effective a means of formulating a workable rule as any of the others. We agree with the editor's comment (45 A. L. R. 2d 1450):

"It seems clear, however, in the light of current medical and psychiatric information, that the ability to 'know' right from wrong should no longer be presented to jury or witness in the exclusively intellectual sense in which that word has ordinarily been used in the application of the rule in the past, but that the test should be the accused's ability to emotionally and intellec-

tually realize and appreciate, as an integrated personality, the nature and consequences of the moral choice presented, and that the mere ability to verbalize a correct answer to questions about the distinction should not be accepted as conclusive on the issue of criminal responsibility. And, by the same token, the tendency of some of the courts to hold opinion testimony on the question to the narrow issue of strictly intellectual capacity should be corrected, and experts should be permitted to make freely available to court and jury the benefit of their technical information upon the issue."

While, as previously indicated, we are not certain of the basis of the decision of the trial court, we assume that he, perhaps justifiably, considered that a limited, strict, and literal application of the statute was required by our previous decisions and that this, in turn, required a decision of guilty.

In brief summary, our decision is:

(a) Where the issue of insanity is raised in a criminal trial, evidence should be received freely so that the factfinder can, in the language of Mr. Justice Blackmun, "take account of the entire man and his mind as a whole." [10] Under our statute the question of what evidence or testimony is appropriate, relevant, or competent in the trial of a case such as this is a judicial question.

(b) In determining whether or not a defendant has met the burden imposed on him by statute to prove absence of guilt because of insanity, the factfinder may give credence to competent evidence that relates to cognition, volition, and capacity to control behavior. The basic question of fact remains, however, whether in the light of this burden and this evidence the defendant was laboring under such a defect of reason as not to know "the nature of his act, or that it was wrong."

■ We hold that in this case defendant established under the statute as we now construe it that he was laboring under such a defect of reason from mental illness that he did not know the

---

[10] Pope v. United States, 372 F. 2d 710, 736 (8 Cir. 1967).

nature of his act or that it was wrong, and that he should have been found not guilty because of insanity. Accordingly, the judgment of guilty is vacated with directions to enter a judgment of not guilty by reason of insanity and for proceedings thereafter in the district court for commitment pursuant to Minn. St. 631.19.[11]

This decision makes unnecessary consideration of the other issue raised in this appeal.

Reversed.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

_____

[11] Normally, we would remand for a new trial in a case of this kind, but because evidence was quite freely admitted and because we believe defendant's proof requires reversal we take the action indicated.