## LORRAINE ELLA WARNER v. STATE.

244 N. W. 2d 640.

July 16, 1976—No. 45682.

C. Paul Jones, State Public Defender, and Gregory A. Gaut, Assistant Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Keith M. Brownell,* County Attorney, and *Gregory K. Larson,* Assistant County Attorney, for respondent.

Heard before Sheran, C.J., and Otis and Yetka, JJ., and considered and decided by the court en banc.

OTIS, JUSTICE.

These proceedings have been instituted by petitioner to obtain her release from the state hospital at Moose Lake where she has been confined following her acquittal of murder in the first degree on the grounds of insanity. The trial court held that the petitioner had not proved by a fair preponderance of the evidence that no person would be endangered by her release and accordingly denied relief. We reverse and remand for further proceedings in the trial court.

On September 13, 1972, the petitioner Lorraine Warner shot and killed her former husband, Nathan Shapiro, in the St. Louis County Court House. She was indicted for murder in the first degree but was found incompetent to stand trial and confined in a state hospital until November 5, 1973, when a further psychiatric examination determined she was capable of defending herself. Trial began on December 10, 1973, and terminated January 11, 1974, when she was found not guilty by reason of insanity. She was accordingly committed to a state hospital pursuant to Minn. St. 631.19. The pertinent provisions of that statute which govern these proceedings are as follows:[1]

---

[1] Minn. St. 631.19 was superseded on July 1, 1975, by Rule 20.02, subd. 8(1), Rules of Criminal Procedure, which reads as follows: "(1) When a defendant is found not guilty by reason of mental illness, and the defendant is under civil commitment as mentally ill, the court shall order that the commitment be continued, and if not under commitment, the court shall cause civil commitment proceedings to be instituted against him and that the defendant be detained in a state hospital or other facility pending completion of the proceedings. The commitment or continuing commitment in felony and gross misdemeanor cases shall be subject to the supervision of the trial court as provided by Rule 20.02, subd. 8(4)."

"The person so acquitted shall be liberated from such hospital upon the order of the court committing him. There shall be first presented to the court the certificate, in writing, of the head of the hospital where such person is confined, certifying that in the opinion of such head of the hospital such person is improved sufficiently to be released and that no person will be endangered by his discharge.

"After receiving the recommendation contained in the certificate, if the court determines that such person has improved sufficiently to be released and that no person will be endangered by his discharge, the court shall order his release.

"If the head of the hospital fails or refuses to furnish such certificate at the request of the person committed, then such person may petition such court for his release, and hearing on the petition shall be had before the court upon and after service of such notice as the court shall direct.

"If, at such hearing, the evidence introduced convinces the court that no person will be endangered by his release on parole or discharge from such hospital, and a proper and suitable person is willing to take such committed person on parole, and to furnish a home for him and care for and support him, then the court may order the release of such confined person from such hospital on parole and for such time and upon such terms and conditions as the court may determine and order, and thereupon such person shall be so released from such hospital and placed on parole or discharge with the person named by the court in its order."

The principal issue which emerges on appeal is whether or not the trial court imposed on petitioner the burden of proving her recovery to a degree of certainty which was not contemplated by the statute. The standard applied by the court was "unqualified assurance that no one will be endangered" by petitioner's release. Having found "a reasonable possibility that Lorraine Warner could have a reoccurrence of the symptoms of her para-

noid thinking" the court held "she could be dangerous" and therefore denied her petition.[2]

1. We are of the opinion and hold that a patient is improved sufficiently to be released from the hospital when there is undisputed medical evidence that she has recovered from her mental illness, that the possibility of a relapse is slight, and that there is no reason to believe the patient will suffer a reoccurrence of her prior disability so as to constitute a danger to herself or to other persons. We do not, of course, suggest that a patient may never be released where there is a disagreement in the medical testimony concerning her recovery. Under such circumstances the trier of the fact will have the duty of determining whether or not the petitioner has sustained her burden of proving she has met the standards of release set forth in the statute as construed by us. Here, however, the medical experts, with minor discrepancies, are of one mind.

Dr. John E. Haavik, a psychiatrist and medical director of the Human Development Center in Duluth, examined Mrs. Warner soon after she shot her former husband and continued to see her on a monthly basis at the Moose Lake State Hospital. He had diagnosed her illness as a paranoid-type schizophrenia. Dr. Haavik recommended that if Mrs. Warner is released she continue on-going psychiatric treatment, that she carry out her plan to undertake secretarial training, and that she secure employment.

Mrs. Warner had been hospitalized in 1961, in 1964, and in 1968 for a similar mental illness and in each instance experienced a remission followed by a relapse. In rendering his opinion and in making his prognosis, Dr. Haavik and the other medical witnesses had those episodes in mind.

Dr. George Cowan, a board certified psychiatrist, also testified on behalf of Mrs. Warner whom he examined on November 8, 1973, and again on December 20, 1974. It was his opinion that

[2] See the appendix for a complete statement of the court's Findings of Fact and Conclusions of Law and Memorandum.

Mrs. Warner had recovered from her mental disorder and was no longer a danger to herself or any other person. While he acknowledged there was no way of predicting the possibility of a relapse, he felt the prognosis was good and that there was no reason to believe Mrs. Warner would develop further delusions, the possibility of their reoccurring being "slim."

Dr. W. I. Davis, who is on the staff of the Moose Lake State Hospital, has been treating mentally ill patients since 1956. He saw Mrs. Warner almost every day. He too testified that, in his opinion, Mrs. Warner was improved sufficiently to be released without constituting a danger to anyone. When asked if there was any possibility of her suffering a relapse, he stated, "I would think the chances are almost infinitesimal." He characterized Mrs. Warner's condition as "the most remarkable, complete and total recovery that I have ever seen." He concluded by recommending that if released she receive some out-patient treatment and possibly medication.

Finally, on behalf of the state the testimony of Dr. John E. Mulvahill was introduced by deposition. He also is a board certified psychiatrist who examined Mrs. Warner first in December 1972 and then in December 1974. He diagnosed her condition as schizophrenia, paranoid-type. When he first examined Mrs. Warner she experienced delusions of reference and of persecution. At the time she shot her former husband she was psychotic and out of touch with reality, the doctor testified. Whereas at his first examination Mrs. Warner appeared to be emotionless and devoid of expression, she was near tears and expressed remorse and regret the last time he saw her. His current diagnosis was that Mrs. Warner was still suffering from schizophrenia, paranoid-type, but was in a state of remission. He was of the opinion that she "still contains a strong potential recurrence of this paranoid schizophrenic illness" but showed no evidence of delusions or hallucinations. However, "[g]iven the right set of circumstances, sufficient emotional stress, insufficient emotional support or not enough medication or something, the illness could

relapse and recur." It was Dr. Mulvahill's conclusion that Mrs. Warner had substantially improved, and that it was in her best interests and in the best interests of society that she be released. He believed she would not thereby endanger herself or any other person.

The statute imposes on the medical profession and on the courts a grave responsibility for determining the difficult question of when a mental patient is capable of being released from an institution without posing a threat to society. Lausche v. Commissioner of Public Welfare, 302 Minn. 65, 225 N. W. 2d 366 (1974), certiorari denied, 420 U. S. 993, 95 S. Ct. 1430, 43 L. ed. 2d 674 (1975). Appellate courts may not and do not lightly set aside the considered judgment of a trial judge except in the most unusual circumstances. Here, the trial court was troubled by Mrs. Warner's prior history of mental illness and by the fact that none of the doctors could testify with absolute certainty that she would not in the future become dangerous. While the court's concern is understandable, we believe that it is the policy of this state not to impose such a rigid standard as that which the trial court adopted. In reaching this conclusion we are influenced by the fact that Minn. St. 631.19 formerly required certification, as a prerequisite to release, that the patient is "wholly recovered." However, that provision was repealed by L. 1971, c. 352, § 3, and the words "improved sufficiently to be released" were substituted.

The issue then is whether Mrs. Warner's state of remission from schizophrenia and paranoia may be controlled and, if not, whether she will be dangerous to others. As we have indicated in our recitation of the medical testimony, the doctors are in accord that the pressures of her marriage which precipitated her psychotic delusions and resulted in her killing her former husband are no longer present, that her illness is in a state of remission and its symptoms are arrested, and that the likelihood of a relapse is only slight. Under these circumstances all of the doctors recommend that she be released from the institution and

agree that this can be done without danger to herself or to the public. In this state of the evidence the question of Mrs. Warner's release becomes essentially a medical and not a legal decision. The court was not at liberty to substitute its nonprofessional prognosis for that of the medically trained witnesses who were of a different view. State v. Rawland, 294 Minn. 17, 40, 199 N. W. 2d 774, 787 (1972).

In both the trial court, and in this court, counsel for Mrs. Warner have sought for her only conditional release or parole with supervision and treatment. In remanding the case to the district court, we do so for the purpose of having an additional hearing conducted to fashion the mechanics of such a program. It is apparent to the doctors, to counsel, and to us, that Mrs. Warner's activities on release should be carefully monitored and that those responsible for supervising her be alert to symptoms of regression. To this end it seems advisable that she be provided with structured living conditions, that she receive whatever outpatient psychiatric care seems indicated, and that she be under the supervision of someone trained and experienced in social work for whatever length of time is appropriate.

We note that Dr. W. Wyatt Moe of Minneapolis has agreed to accept Mrs. Warner as a patient if she is released. In addition, the Division of Vocational Rehabilitation of the State Department of Education has indicated that Mrs. Warner is eligible for secretarial training at state expense. Equally essential to her program is a proposal by a social worker for the Adult Services Division of the Hennepin County Welfare Department addressed to the trial court as follows:

"For your information I have been assigned by this agency to work with Ms. Warner in the event that she may be in need of placement and vocational planning in Hennepin County.

"Presently we have several possible living situations available, where Ms. Warner would have 24 hour supervision and where there would be available recreational activities and orientation to this community. It is my understanding that arrange-

ments have been made for her to attend the Minnesota School of Business and I would be available to assist in implementing these plans, maintaining communication with the school as needed. If Ms. Warner were to be under the psychiatric care of Dr. W. Wyatt Moe, there should be good coordination of effort, as Dr. Moe and I have worked together successfully in a number of problem situations. Should the Court desire, I would be willing to submit composite reports on Ms. Warners progress at stipulated intervals.

"Should you have any questions regarding further details of our resources to assist Ms. Warner in the event that she comes to this area, please feel free to inquire."

To the extent that these or similar resources are appropriate and available they should again be considered by the trial court as conditions of Mrs. Warner's release.

2. Although the issue has become moot, we have, for the second time, been asked to specify the role of the trial court in authorizing home visits for patients confined in state hospitals. Rawland v. Sheppard, 304 Minn. 496, 232 N. W. 2d 8 (1975). As we indicated in Rawland, unless the issue is before the trial court it may not prohibit home visits sua sponte.[3] We have pointed out that Minn. St. 631.19 has been superseded by Rule 20.02, subd. 8, Rules of Criminal Procedure, and will await the application of the new rules by trial courts before attempting to construe them.

3. On appeal, Mrs. Warner has challenged the constitutionality of Minn. St. 631.19. However, that question was not litigated

---

[3] The pertinent statute governing civil commitment procedures is contained in Minn. St. 253A.15, subd. 8, as follows: "The head of a hospital may place any patient hospitalized pursuant to sections 253A.01 to 253A.21 on a status of partial hospitalization. Such status shall allow the patient to be absent from the hospital for certain fixed periods of time. Such patient shall be placed on such status in a state hospital under such terms and conditions as are established by the commissioner. The head of the hospital may terminate such status at any time."

in the trial court nor argued in this court and we therefore decline to pass on the issue.

Reversed and remanded with directions to grant petitioner Lorraine Warner conditional release on parole and to conduct a further hearing to establish the conditions of her release.

APPENDIX

STATE OF MINNESOTA                    DISTRICT COURT
County of St. Louis                          Sixth Judicial District

LORRAINE ELLA WARNER,

*Petitioner,*

vs.

STATE OF MINNESOTA,

*Respondent.*

FINDINGS OF FACT
CONCLUSIONS OF LAW

This matter came on for hearing on January 17, 1975, upon application of Lorraine Warner for release from the Minnesota State Security Hospital, where she is being confined pursuant to Court Order. The Petitioner was represented by Mr. Greg Gaut, Esquire, Public Defender. The State was represented by Mr. Robert E. Lucas, Esquire, Duluth, Minnesota, a Special Assistant County Attorney, who has been employed for this purpose.

The matter was continued one week until January 24, 1975, for the purposes of argument and to give both the Court and Counsel the opportunity to review the records and deposition.

Now, therefore, based upon the file and all of the evidence and testimony, transcripts and the arguments of Counsel, the Court makes the following:

FINDINGS OF FACTS

1. That the Petitioner, Lorraine Warner, was indicted by a Grand Jury of St. Louis County, for the murder of her former husband on September 14, 1972. The indictment charged first

degree murder in that Lorraine Warner premeditatedly killed Nathan Shapiro on September 13, 1972.

2. That the District Court immediately ordered a psychiatric evaluation of Petitioner and pursuant to the report of a Duluth psychiatrist, committed her to Moose Lake on October 6, 1972. The Court found that the petitioner was unable to stand trial and unable to cooperate sufficiently with her attorney.

3. Petitioner remained in Moose Lake State Hospital until November of 1973.

4. On November 5, 1973, Lorraine Warner was adjudged competent to stand trial and entered a plea to the charge of murder in the first degree.

5. Trial commenced on December 10, 1973, and concluded on January 11, 1974, with a jury verdict of not guilty by reason of insanity and by finding of homicidal tendencies.

6. Pursuant to Minnesota Statutes 631.19, Petitioner was committed to the Minnesota Security Hospital. However, for the convenience of the Commissioner of Welfare, she was transferred to the Moose Lake State Hospital at Moose Lake, Minnesota.

7. That on July 25, 1974, the superintendent of the hospital, pursuant to statute, certified that the Petitioner was sufficiently improved to be released and that no person would be endangered by her release.

8. That pursuant to that certification, the Public Defender petitioned this Court for Lorraine Warner's release.

9. That a hearing was held pursuant to statute on January 17, 1975.

10. That at the time of the killing of Nathan Shapiro, Lorraine Warner was suffering from a mental disability known as schizophrenia, paranoid-type.

11. That at the present time the petitioner has a mental illness or disability of schizophrenia, paranoid-type, in remission.

12. That there is a reasonable possibility that Lorraine Warner could have a reoccurrence of the symptoms of her paranoid thinking and that therefore, she could be dangerous.

## CONCLUSIONS OF LAW

1. That the petitioner has failed to meet her burden to prove by a fair preponderance of the evidence that (a) she has sufficiently improved to be released from the hospital and (b) that she no longer constitutes a danger to herself or others.

IT IS HEREBY ORDERED, that the Petitioner, Lorraine Warner's motion is in all respects denied, and that she be returned and kept at the Moose Lake State Hospital, in conformity of the Order of this Court dated January 11, 1974.

## MEMORANDUM

This matter was originally tried before the undersigned in a rather long but well tried trial. It was obvious to me, as it must have been obvious to the jury, that the State demonstrated a premeditated murder, beyond any reasonable doubt. It was also obvious to me as it was obvious to the jury, that the defense demonstrated that the petitioner was insane at the time of the killing. Lorraine Warner was suffering from schizophrenia, paranoid-type, as testified to by all three psychiatrists who testified to in her behalf. This mental disability was evidenced by delusional thinking which was directed toward her former husband Nathan Shapiro. These delusions were sufficiently strong so that the Petitioner lost contact with reality and was so tormented by delusional thinking that she killed Nathan Shapiro to eliminate the object of the delusional thinking.

It should be noted, that Mrs. Warner was hospitalized on three occasions prior to the killing in the psychiatric ward of St. Mary's Hospital in Duluth, Minnesota. That on each of these occasions, she was treated by a psychiatrist and released. That on each of these occasions, her diagnosis was the same as the diagnosis made by the psychiatrists at trial, schizophrenia, paranoid-type. The hospital records offered and received at trial also indicated that Lorraine Warner had dangerous propensities as early as 1961. It should also be noted that immediately after the killing, the Petitioner indicated that she had at least one and possibly two more people on her list.

It is the Court's impression that the Petitioner still carries the illness or mental disability and that while her symptoms are in remission, there is no possible way to estimate or predict the probability of repetition.

In view of the long history of the mental disability, it is my impression that the disability cannot be cured.

In making this decision, I believe that there is a continuing presumption of insanity, *State vs. Karen Nomiya,* 1970 [287] Minn. 487, 178 NW 2d 905, and State ex rel. Sundberg vs. District Court, 185 Minn. 396, 400, 241, NW 39, 40 (1932). It is my further belief that the petitioner has failed to convince the Court that she will be a danger to no one upon release.

The Court has reviewed and compared the facts and opinions disclosed during the trial and the subsequent hearings and arguments as well as the demeanor and attitudes of the witnesses.

All have agreed that the defendant has repeated and cyclical reoccurrences of her mental disorders. All have agreed that she has recovered from her most recent disorder. All have agreed that no guarantee can be given that such a disorder will not occur in the future.

Based on the record produced in this Court and the hospital records and the facts of the case, the Court is compelled to the conclusion that disputes the opinions of her treating psychiatrists; that the overwhelming opinion sustains the opinion that the protection of the public demands a conclusion that she is yet a danger to the community. To conclude otherwise would be to release into the community, an individual who has demonstrated to the most expert medical authorities over an extended period of time, that it is not possible to predict her actions under situations of strain.

The Court cannot accept responsibility of her release under any conditions without the unqualified assurance that no one will be endangered, who is entitled by statute to protection from her actions.

The treating psychiatrists concede the possibility of relapse,

a condition which has occurred with some regularity in the past. Although one object of her delusions has been eliminated by her action, we have no assurance that other persons may not become the object of increased delusions on her part. In the past the delusions have also centered on her mother and her brother-in-law.

No one can assure us that increased pressures and tensions in the passage of time will not increase these delusions to a point equal to the delusions she experienced with respect to her former husband. To that group must be added the witnesses who testified at her trial.

It can be assumed that given a period of stress, that she will react against these persons. Under these circumstances, the experts cannot guarantee that her explosive conduct will not be repeated. The protection of these people demands that she be restrained and confined until such time as an unqualified assurance can be given that they would not be endangered by her release.

The Court's opinion does not preclude the certification at a future date, where it can be demonstrated by experienced and scientific observation, that she is no longer a danger to society.

At this point in time it is too premature to convince the Court that releasing her back in the environment that produced the violent reaction that resulted in the death of a human being would be within the meaning of the statute.