**STATE of Minnesota, Respondent,**

v.

**Steven A. SCHREIBER, Appellant.**

**No. CX–95–2522.**

Supreme Court of Minnesota.

Jan. 16, 1997.

Michael McGlennen, John M. Stuart, Minnesota State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Atty. General, St. Paul, Robert M. A. Johnson, Anoka County Atty., Marcy S. Crain, Asst. County Atty., Anoka, for respondent.

## OPINION

PAGE, Justice.

Steven Allen Schreiber (Schreiber) was indicted on four counts of first-degree murder under Minn.Stat. § 609.185(1), (3) (1996), and one count of child endangerment resulting in substantial bodily harm under Minn.Stat. § 609.378, subd. 1(b)(1) (1996), as a result of the shooting deaths of his estranged wife, Tulin Schreiber, and his stepdaughter, Shyla Mujwid, and a gunshot wound to his five-year-old son, Matthew Schreiber. At trial, Schreiber pled not guilty and not guilty by reason of mental illness under Minn.Stat. § 611.026 (1996).[1] After the guilt phase of the trial, the jury returned guilty verdicts on all counts. After the mental illness phase of the trial, the jury rejected Schreiber's mental illness defense and reaffirmed the guilty verdicts on all counts. In this appeal, Schreiber raises four issues: (1) whether precluding psychiatric testimony on the issues of intent and premeditation in the guilt phase of a bifurcated trial violates the defendant's due process right to present a defense; (2) whether precluding psychiatric testimony on the issues of intent and premeditation in the guilt phase of a bifurcated trial alleviates the prosecution's burden of proving every element of the crime; (3) whether the factfinder must be permitted to consider the defendant's volition and capacity to control behavior when determining if the defendant knew the nature of his act or that it was wrong under the Minnesota M'Naghten insanity definition;[2] and (4) whether a bifurcated trial prejudicially precludes the submission of jury instructions on a lesser included offense in the guilt and mental illness phases. We affirm.

The evidence at trial established that, in 1986, Schreiber married Tulin Mujwid, who had two children from a previous marriage, Shyla and Atilla. A year after they married, Atilla was killed in an auto/bicycle accident. It is unclear from the record when, but at some point Schreiber began to believe that Tulin and Shyla thought he was responsible for Atilla's death. In 1989, a son, Matthew, was born to Tulin and Schreiber. In March 1992, Tulin, unhappy in the marriage, began

---

1. In Minnesota, a defendant who pleads not guilty by reason of mental illness or mental deficiency receives a bifurcated trial under Minn. R.Crim.P. 20.02, subd. 6(2). The first part of the trial involves the determination of whether the state has sustained its burden of proof as to the defendant's guilt. See Minn.R.Crim.P. 20.02, subd. 6(4)(a). If the defendant is found guilty at the end of the first phase, then the second phase takes place to determine whether the defendant has sustained the burden of establishing the defense of mental illness. Id.

2. Minnesota Statutes section 611.026 sets forth the standard for determining excuse from criminal liability by reason of mental illness and is a codification of the M'Naghten rule, first established in Daniel M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718 (H.L.1843). The statute provides that a defendant is not guilty by reason of mental illness if, at the time of the criminal act, the defendant did not know the nature of the act or did not know that it was wrong because of a defect of reason caused by a mental illness or deficiency. Minn.Stat. § 611.026.

dating her supervisor at work. Tulin planned to divorce Schreiber that summer and marry her supervisor, but she postponed those plans when Schreiber began to manifest psychological problems. Schreiber began to think that he was being watched and that his telephone, eyeglasses, watch, and ring were bugged. On one occasion, Schreiber poured out a freshly brewed pot of coffee at his home because he thought it was drugged. During a deer hunting trip, thinking that another member of the hunting party had poisoned his mustache, Schreiber tried to cut his mustache off with a buck knife. Finally, in early November 1992, Schreiber was hospitalized for about a month for depression after his parents found him in his bedroom with a loaded gun, contemplating suicide. Schreiber was readmitted to the hospital for a week in December 1992. In late January 1993, Tulin and Schreiber separated, and Tulin, Shyla, and Matthew moved out of the family home into a townhome in Coon Rapids, Minnesota. Despite the separation, Schreiber maintained close contact with Tulin, Shyla, and Matthew.

On a deer hunting trip during the first weekend of November 1994, Schreiber told his brother Tom Schreiber that people were watching him and that Tulin took everything away from him, including his privacy. At one point during the trip, Schreiber punched a truck door and screamed, "I ought to kill her and kill myself" or "kill the bitch and kill myself" and "get it over with." Also, early in November, Schreiber had a conversation with Dean Harms, a co-worker of his at United Parcel Service, in which Harms asked Schreiber about his relationship with Tulin, and Schreiber responded that "something was going to be done about it." When Harms asked Schreiber if he meant a divorce, Schreiber said no and repeated that something was going to be done about it.

Schreiber had been paying weekly child support to his ex-wife, Sandra Stangel, since their divorce in 1982. He had never prepaid that child support. Two weeks before the shootings, Schreiber, without explanation,

prepaid two weeks of child support. During that time period, Schreiber called Tulin's friend, Lorraine Jewett, and told her that he loved Tulin and wanted to get back together with her. However, he also told Jewett that he thought Tulin had information that "could ruin him or really hurt him." By November 16, 1994, Schreiber was aware that Tulin had commenced divorce proceedings.

During the weekend of November 19 and 20, Schreiber went on a deer hunting trip with Scott Schreiber, his son from his marriage with Stangel. At the end of the last day of the trip, Schreiber, who was safety conscious and did not keep his guns loaded when he was not hunting, unloaded the ammunition from his rifle, a Browning 7mm semiautomatic, and put the rifle in its case.

On November 22, Schreiber called several family members and friends. At 5:30 p.m., he called his mother, Donna Schreiber, and told her that he thought his phone was bugged and that he had made an appointment for November 30 to get more medication.[3] During this conversation, Schreiber had difficulty finishing his sentences. Schreiber also called his girlfriend, June Snair, and his brother Tom. According to Snair, she could tell that something was wrong; according to Tom, Schreiber sounded depressed, but nothing else seemed unusual. In addition, Schreiber called Tulin. He asked to talk to Shyla, who was not home. Schreiber then asked Tulin to have Shyla call him back, but she never did.

On the morning of November 23, Schreiber was scheduled to report for work at UPS at 3 a.m., but called in sick about an hour before his shift. At about 5:30 a.m., Schreiber called his father, Joseph Schreiber, and told him that he had taken the day off work and was going to Tulin's townhome to pick up Matthew. According to Joseph, there was nothing strange about the phone call except it seemed like Schreiber wanted to say something but could not.

---

**3.** Schreiber had been prescribed medication for his psychological problems during his hospitalization in 1992 and the medication had evidently been running low. His family tried unsuccessful-

ly to refill his prescription on November 20. On November 22, Tulin told Larson she was concerned about Schreiber because he was running out of medication.

At approximately 5:45 a.m., Tulin woke up Shyla and her best friend, Danielle Wincek, who was staying the night, and told them that Schreiber had called and was coming over for Matthew. Wincek and Shyla heard Schreiber arrive; a short time later, they heard a loud bang, after which they heard Matthew screaming and crying. About 30 seconds later, Schreiber opened Shyla's bedroom door, turned on the light, and, looking surprised, stood in the doorway, holding a rifle with his right hand above the trigger with the barrel pointing up. Shyla jumped out of bed and ran to him with her hands up. As she approached, Schreiber backed out of the room and said something about ending his life. Shyla and Schreiber went into the living room where Wincek could not see them any longer, but Wincek heard Shyla say in a loud, pleading voice, "Steve, don't, Steve, don't," immediately followed by a loud bang. Approximately five seconds later, Wincek heard another bang. She then saw Schreiber walk past the bedroom door saying, "Shyla, you made me do this."

After the shootings, Schreiber called his mother, hysterical and crying, and told her that he had just shot Tulin and Shyla. Schreiber also called 911 and told the dispatcher that he had just shot his wife and daughter. When the police arrived at the scene, Schreiber turned himself in. Initially, the officers put Schreiber on the ground and handcuffed him. While on the ground, Schreiber told the officers that he had shot his ex-wife and daughter and that he wanted to kill himself. When Schreiber was placed in the back seat of a squad car, he defecated in his pants and vomited. According to one of the officers, while Schreiber appeared depressed and cried intermittently, he also appeared to understand the officer's directions, both at the hospital, where a blood sample was taken, and later at the jail.

When the police entered the townhome, they found no signs of a struggle. Tulin was found upstairs lying on the floor with serious abdominal wounds. She was taken to the hospital where she died a short time later. Shyla was found dead in the downstairs living room, having been shot twice—once in the left thigh and once in the head. Matthew was found sitting on the steps with a gunshot wound to his hip and knee. At the hospital, Matthew said, "[i]t's like mom has to tell my dad lot's [sic] of times to get out of the house" and that Schreiber shot Tulin after "ma said a bad word." The police found a rifle case at the top of the steps containing an unloaded Browning 7mm semiautomatic rifle. Another firearm, an unloaded 25–06 caliber Remington high-powered rifle, was found inside a closet. Two spent 7mm shell casings were found downstairs and one spent 7mm shell casing was found upstairs.

The Anoka County Coroner conducted autopsies on Tulin and Shyla. The coroner concluded that Tulin was shot in the abdomen while facing forward and died from massive internal bleeding. The location of Matthew's and Tulin's wounds, combined with the fact that there was only one expended shell casing found near Tulin's body, led the coroner to conclude that Tulin was holding Matthew when she was shot, and that one bullet went through Matthew's hip, then through Tulin's abdomen, and exited into Matthew's right knee. The coroner concluded that Shyla was standing and holding the gun's muzzle with her right hand when she was shot in the thigh. After falling to the ground, she was shot in the head from one or two feet away. The coroner concluded that the shot to Shyla's left thigh was not fatal, but the shot to her head was.[4]

Schreiber did not testify during the guilt phase of the trial, nor did he present any evidence. The jury found Schreiber guilty on all four counts of first-degree murder and the one count of child endangerment.

During the mental illness phase of the trial, seven mental health experts—five psychiatrists and two psychologists—testified as to Schreiber's mental state. Two of the psychiatrists opined that Schreiber was M'Naghten insane at the time of the shootings, and one opined that he was not insane at that time. The remaining four mental health experts, while not expressing an opinion as to Schreiber's sanity, did testify as to

---

4. Schreiber's son Scott testified that Schreiber had taught him how to shoot deer, instructing him that once the deer was down, he needed to make a second shot called a kill shot.

Schreiber's mental state before and after the shootings. In addition, there was testimony from members of Schreiber's family, friends, and law enforcement personnel, regarding his mental state before and after the shootings. As in the guilt phase, Schreiber did not testify during the mental illness phase of the trial. The jury rejected Schreiber's mental illness defense and again returned guilty verdicts on all counts. Schreiber was sentenced to a term of life in prison for Tulin's murder under Minn.Stat. § 609.185(1), a consecutive term of life in prison for Shyla's murder under Minn.Stat. § 609.185(1), and a concurrent term of 12 months and one day for child endangerment.

In this appeal, Schreiber does not contest the sufficiency of the evidence presented in either the guilt or mental illness phases of his trial, nor does he dispute the facts established at trial. Rather, Schreiber argues that the procedures used and the legal standard for establishing a mental illness defense in Minnesota should be changed. These arguments raise purely legal questions which this court reviews de novo. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

None of the issues or arguments Schreiber presents in this appeal are new. In fact, we have specifically addressed each issue and rejected each argument in prior decisions. In raising these issues and arguments anew, Schreiber has not provided any compelling reasons to overturn those prior decisions.

■ Schreiber first argues that by precluding psychiatric testimony on intent and premeditation in the guilt phase of a bifurcated trial, the defendant's due process right to present a defense is violated. We have, in the past, considered all of the arguments raised by Schreiber with respect to this issue and have repeatedly held that precluding psychiatric testimony on intent and premeditation in the guilt phase of a bifurcated trial does not violate the defendant's due process right to present a defense. *See State v. Brom*, 463 N.W.2d 758, 763–64 (Minn.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991) (precluding psychiatric testimony relating to premeditation and intent did not deny defendant due process);

*State v. Jackman*, 396 N.W.2d 24, 29 (Minn. 1986) (same); *State v. Hoffman*, 328 N.W.2d 709, 715–16 (Minn.1982) (finding that defendant's right to present evidence of mental capacity only arises during the mental illness phase, and not the guilt phase); *see also State v. Bouwman*, 328 N.W.2d 703, 705 (Minn.1982) (finding that evidence of mental capacity is irrelevant to determine intent during state's case because state carries burden to establish intent and such evidence only becomes relevant during defendant's case when defendant carries burden of establishing mental illness defense). Schreiber has not provided this court any reason to reach a different result here.

■ The second issue Schreiber raises is whether precluding psychiatric testimony on the issues of intent and premeditation in the guilt phase of a bifurcated trial alleviates the prosecution's burden of proving every element of the crime. Schreiber argues that, because psychiatric testimony on intent and premeditation is prohibited in the guilt phase of the trial, sanity is presumed and, as a result, in the mental illness phase, sanity becomes "irrebuttable" because the factfinder has already found the defendant sane. Essentially, Schreiber is raising a due process challenge to the validity of Minn.Stat. § 611.025 (1996), which provides that "in every criminal proceeding, a person is presumed to be responsible for the person's acts and bears the burden of rebutting such presumption." We have previously held that neither section 611.025 nor section 611.026 denies the defendant due process under either the state or federal constitutions. *See State v. Bott*, 310 Minn. 331, 335, 246 N.W.2d 48, 52 (1976) (citing *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)); *State v. Mytych*, 292 Minn. 248, 254–55, 194 N.W.2d 276, 280–81 (1972) (placing the burden of persuasion on defendant of proving insanity did not violate the defendants' due process rights (citing *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952))). Again, as with the first argument, Schreiber has not provided this court any reason to reach a different result.

Schreiber's third argument is that Minnesota's M'Naghten insanity definition found in Minn.Stat. § 611.026 must be expanded to include consideration of the defendant's volition and capacity to control behavior. Specifically, Schreiber objects to the jury instructions given in the mental illness phase of his trial because the scope of the instruction and definition of the mental illness defense were limited to cognition and did not include consideration of the defendant's volition and capacity to control behavior.[5]

In *State v. Rawland,* 294 Minn. 17, 199 N.W.2d 774 (1972), this court upheld the literal construction of Minn.Stat. § 611.026 against Eighth and Fourteenth Amendment challenges. We avoided constitutional infirmity by permitting the factfinder to consider competent evidence of volition and capacity to control behavior, as well as cognition, to determine whether the defendant meets the M'Naghten standard. *Id.* at 46, 199 N.W.2d at 790. Thus, under *Rawland,* the jury *may* hear evidence of the defendant's volition and capacity to control behavior. However, since *Rawland,* we have consistently held that *Rawland* did not alter the standard for a legal finding of insanity and that an instruction on volition and capacity to control behavior need not be given. *See State v. Jolley,* 508 N.W.2d 770, 772 (Minn.1993); *State v. LaTourelle,* 343 N.W.2d 277, 282–83 (Minn. 1984); *State v. Larson,* 281 N.W.2d 481, 486 (Minn.), *cert. denied,* 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). Because Schreiber again fails to provide this court with any reason to abandon the conclusions reached in this line of cases, we reject his arguments.

Finally, we also reject Schreiber's argument that bifurcating trials based on a mental illness defense prejudicially precludes a jury instruction on lesser included offenses. Schreiber argues that evidence of mental illness should be allowed to support a lesser degree of guilt and, consequently, a lesser included offense instruction. This argument fails for two reasons. First, the trial court has discretion to determine the lesser included offenses, if any, to be submitted to the jury. *State v. Leinweber,* 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). The test for determining which lesser included offenses to submit is "whether the evidence would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified." *Id.* at 421, 228 N.W.2d at 125–26. *See also State v. McDonald,* 312 Minn. 320, 321, 251 N.W.2d 705, 706 (1977) (finding the test for submitting lesser included crimes is whether there is a rational basis for verdict acquitting defendant of greater offense and convicting of lesser offense). In the guilt phase of Schreiber's trial, the trial court did in fact put before the jury the lesser included offense of second-degree murder for the death of Tulin. Thus, Schreiber has no complaint. Based on our review of the record in this case, we conclude that the trial court properly applied the test and did not abuse its discretion.

As his argument relates to the mental illness phase of the trial, we understand it to

---

5. The trial court gave the following jury instruction on mental illness:

Under the statutes of Minnesota a person is not criminally liable for his acts when at the time of committing these acts because of a defect of reason caused by a mental illness the person did not know the nature of his acts or did not know that they were wrong. * * *

First, the defendant did not know the nature of his act. This means that the defendant did not understand what he was doing. If because of a defect of reason the defendant did not know what act he was doing or what the consequences of his act would be, then the defendant did not know the nature of his act.

Second, even if the defendant knew the nature of his act, the defendant did not understand that his act was wrong. The word wrong is also used in the moral sense and does not only refer to a violation of a statute. Stated another way, even if the defendant realized that his act violated the law, the defendant is not criminally liable if because of a defect of reason caused by a mental illness the defendant did not understand that his act was morally wrong.

Third, the failure of the defendant to know the nature of his act or that it was wrong must have been the result of a defect of reason caused by a mental illness.

This instruction is a form of the pattern instruction in 10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 6.02 (3d ed. 1990), which was used and upheld in *State v. Persitz,* 518 N.W.2d 843, 849–50 (Minn.1994), and *State v. Jolley,* 508 N.W.2d 770, 771–72 (Minn.1993).

be a request that this court adopt the defense theory of diminished capacity. We rejected this argument in *Bouwman*, reasoning that "the theory of diminished capacity inevitably opens the door to variable or sliding scales of criminal responsibility," which is contrary to the rule that "[t]he law recognizes no degree of sanity." 328 N.W.2d at 706. We reject it again here. For purposes of criminal conviction, a person is either legally sane or legally insane in the eyes of the law and, once there is an adjudication of guilt in the guilt phase of the trial, there is no reason to present lesser included offenses to the jury in the mental illness phase because the issue then becomes whether the defendant is *completely* excused from criminal liability by reason of mental illness.

Because all of the issues presented and arguments raised by Schreiber have been previously addressed by this court and because Schreiber provides no compelling reasons for overturning our prior decisions, Schreiber's convictions are affirmed in all respects.

Affirmed.

BLATZ, J., took no part in the consideration or decision of this case.