STATE of Minnesota, Respondent,

v.

Leonard E. GRIESE, Appellant.

No. C4–96–1196.

Supreme Court of Minnesota.

June 19, 1997.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, Robert R.M. Johnson, Anoka County Attorney by Marcy S. Crain, Assistant County Attorney, Anoka County Government Center, Anoka, for respondent.

Michael F. Cromett, Assistant Public Defender, St. Paul, for appellant.

## OPINION

KEITH, Chief Justice.

Appellant Leonard Griese appeals from his conviction by an Anoka County jury of two counts of first-degree murder. Griese was sentenced to two consecutive life terms for the May 20, 1995 killings of his tenants, Thomas Trafton and Susan Bishop.

On appeal, Griese raises three grounds for reversal of his convictions and remand for a new trial: (1) the district court erred in limiting the scope of expert witness testimony about his mental condition at the time of the killings; (2) the prosecutor engaged in misconduct by improperly questioning a defense witness about the facts underlying the witness's felony convictions and by disparaging the defense in closing argument; and (3) the district court erred in granting the prosecutor's motion to dismiss two second-degree murder counts included in the grand jury indictment. He also argues there was insufficient evidence of premeditation to support first-degree murder convictions. We affirm.

On May 20, 1995, at 11:53 a.m., police received a 911 call from a man at Griese's home in Blaine. The caller, later identified

as Leonard Griese, told the police operator that he had just killed Trafton and Bishop. Before the operator could get more information, the caller hung up. Officer Gary Gice of the Blaine police department arrived at the Griese home within 10 minutes. After spotting no one through the front door, Officer Gice saw Griese through a bedroom window. Griese said something like, "I killed them both. They're both dead." Officer Gice found Trafton and Bishop's bodies in a basement bedroom. Both had been stabbed multiple times and appeared to be dead.

At the time of the killings, Leonard Griese was 53 years old and had lived in Blaine for 28 years with his wife Theresa. Griese worked as a machinist at FMC for 22 years, but had been disabled and unable to work since an automobile accident and subsequent suicide attempt in 1991. Griese had struggled with alcoholism since the 1970s. Although he briefly stopped drinking as part of a New Year's resolution in 1995, Griese was drinking again at the time of the killings as well as continuing to take prescription drugs for heart disease (Mexitil, Atenolol) and depression (Effexor).

The Grieses rented out the basement of their home to Trafton and Bishop in the fall of 1994.[1] The relationship between the Grieses and their tenants was uneventful through late 1994, although Trafton was not paying his rent. In late 1994 or early 1995, however, Trafton and Griese began to argue about the unpaid rent, which by the time of the killings amounted to just over $1,900. Two of these arguments escalated into shoving matches between Trafton and Griese. By April or May, Griese, Trafton and Bishop argued two or three times weekly, usually over the rent or use of a car Griese bought in Bishop's name.

On Friday, May 19, 1995, Griese made two calls to 911 in an apparent attempt to have Trafton removed from the residence. First, Griese called to complain about Trafton's drinking and to ask police to take Trafton to a detoxification center. Later that same night, Griese again called 911, claiming that he heard Bishop "hollering downstairs." When police investigated, they determined that the noise was from the television and was not Bishop. At around midnight, Griese again argued with Trafton and Bishop. Griese testified that at some point that night he thought, "[t]he hell with it" and started drinking.

The next morning, Griese and Trafton again argued about the use of the car. At approximately 8:30 or 9:00 a.m., Anthony Landin saw Griese loading things into the car in the driveway. Griese waved to Landin and mumbled something. Although Landin testified that he was unable to make out what Griese said in the driveway, Landin testified that at some time in the two days prior to the murder, Griese had said that he hated Trafton and wanted him out of the house.

At 10:19 on May 20, Griese called 911 to complain that Trafton had a cylinder of oxygen and was "gonna blow up the neighborhood." When Officer Gice of the Blaine police arrived to investigate, Theresa Griese answered the door. Leonard Griese refused to either speak to Officer Gice or come out of his room. Theresa explained to the officer that Trafton had an oxygen unit in his room because he had cancer. When questioned about the 911 call, Trafton laughed and told the officer that he was having trouble with his landlord. After being reassured by a "jovial" Trafton and Bishop, Officer Gice left.

Brian Bishop testified that he drove his mother and sister to the grocery store at around 10:30 that morning and went back to sleep on a couch after returning at around 11:30 a.m. He was apparently awakened when Theresa Griese screamed at the sight of Griese heading down the stairs with a knife. Officer Gice testified that Theresa told him that Griese said "he was going to kill them," but Theresa testified that she was unsure whether Griese actually said that or she had assumed it. In any case, Theresa testified that Griese had "an awful look on

---

**1.** Bishop's 17-year-old, developmentally and emotionally disabled daughter Michelle and 21-year-old son Brian also lived in the basement of the Griese home, as did Brian Bishop's friend Anthony Landin. All the residents of the house shared a single kitchen on the main level and a single telephone line.

his face" and told her to go to their son John's house.

Hearing Theresa's screams, Brian Bishop ran upstairs and tried to call 911, but the phone was dead. He then drove Theresa to a nearby Food–n–Fuel station to call 911. Theresa spoke to the 911 dispatcher at 11:57 a.m. and said, "My husband was—is drunk, and he was taking a knife after—our renter." Theresa told the dispatcher that she didn't know if anyone was injured, but that she had heard screaming. Minutes earlier, police had received the 911 call from the Griese home in which Leonard Griese stated that he had just killed Trafton and Bishop.

Officer Gice arrived within minutes. After telling Officer Gice that he had killed Trafton and Bishop, Griese let the officer in through the back door. Griese was calm and his speech was not slurred. He had blood on his abdomen, feet and hands, and serious cuts to the middle, ring and little fingers of his right hand. In response to Officer Gice's questioning, Griese indicated that Trafton and Bishop were downstairs. Officer Gice then handcuffed Griese,[2] led him to the living room couch and told him to sit there. Griese walked slowly but had no problems with balance when led to the living room.

On entering the basement, Officer Gice encountered Bishop's daughter Michelle. Michelle told Officer Gice that she heard her mother scream, "Leave me alone," just before Griese emerged from Bishop and Trafton's bedroom, saying, "I killed your mother, go to your room."

Officer Gice found the naked bodies of Trafton and Bishop in the bedroom. Bishop's body was lying on the bed. Bishop's body had 15 knife wounds and a white-handled knife protruded from her back.[3] The knife had a blade about nine inches long with a serrated edge, and was similar to knives found in a wooden block in the Griese kitchen.

Officer Gice found Trafton's body lying on its back on the floor of the bedroom. There were 14 wounds to Trafton's body, all consistent with the knife removed from Bishop's back. A bloodspatter pattern on Trafton's face suggested that he was curled up in a defensive position when the wound causing the spatter was inflicted.

When Officer Gice went back upstairs, Griese was no longer on the couch. The officer found Griese sitting in his bedroom with a cloth on or near his injured hand. Griese walked slowly but steadily when Officer Gice told him to go back to the living room. Officer Gice did not smell alcohol on Griese and testified that he did not believe Griese was under the influence of alcohol.

A paramedic who spent approximately 25 minutes attending to Griese's hand testified that she did not notice the odor of alcohol nor did she notice that Griese had bloodshot eyes. Griese hummed a low hum under his breath and did not answer questions posed by the paramedics or police. However, at one point, Griese looked up and asked that the officers keep someone—presumably Michelle Bishop—out of the house. He said, "Don't let her in," and, "Send her to her grandmother's."

Griese had no trouble with balance when taken to an ambulance, but stumbled getting inside. While in the ambulance, Griese told a paramedic that he had overdosed on blood pressure medication. Police found open pill bottles in Griese's bedroom. There was no blood on the bottles; however, Griese testified that he had taken the caps off earlier in the day to fill his weekly pill container. There was blood on the desktop just to the side of the bottles.

Police officer Jerry Johnson rode with Griese in the ambulance to the hospital. Officer Johnson detected no signs of intoxication during the 10–minute ride. Griese vomited while in the ambulance. The vomit smelled of alcohol, but did not appear to

---

**2.** Because of the injury to Griese's hand, Officer Gice handcuffed him with his hands in front of him.

**3.** Dr. Janis Amatuzio, Anoka County Coroner, testified that the knife was embedded in Bishop's

seventh rib. Dr. Amatuzio also testified that the wounds on Griese's hand were consistent with the assailant's hand slipping when the knife abruptly stopped upon striking Bishop's rib.

contain any pill fragments. Griese did not answer questions during the ride, but asked God for forgiveness. Officer Johnson testified that Griese also said he had "cured the world of a problem" and that now it was his turn to die.

The nurse who attended to Griese for approximately 2 hours at the hospital testified that she believed Griese was intoxicated. He appeared pale when his head was elevated; slurred his speech; was lethargic and sweaty; and smelled of alcohol. On cross-examination, the nurse conceded that Griese did not exhibit other typical symptoms of a drug overdose and that his pallor, lethargy, and sweatiness could have been due to loss of blood from his injuries.

Griese's stomach was pumped at the hospital. The contents of his stomach included unabsorbed ethyl alcohol and white fragments that could have been pill fragments. A blood sample drawn from Griese at 1:07 p.m. yielded a blood alcohol concentration of 0.11 and the presence of the drugs Mexitil and Effexor. A second sample at 3:24 p.m. yielded a blood alcohol level of 0.07 and indicated the presence of Atenolol and Hydroxyzine.

In December 1995, Griese encountered retired firefighter Gary Irwin at the Anoka County jail. Irwin testified that he had a conversation with Griese in a holding cell while awaiting a court appearance for a misdemeanor. Irwin testified that after he and Griese talked about Alcoholics Anonymous, Griese told him that he had killed a woman and a man who had cancer and used oxygen. Griese told Irwin that he had been drinking at the time of the killings and tried to kill himself by overdosing on pills *after* the killings.

Griese originally told officers, and testified at the omnibus hearing in December 1995, that he had no memory of the killings. At trial in March 1996, however, Griese testified that he had been able to gradually remember what happened after reading police reports and other documents related to the case.

Griese testified that he started drinking beer after the second 911 call on May 19, the night before the murders. He also testified that he drank beer on the morning of the murders, but could not remember how much. Although he was feeling dizzy and nauseated that morning, Griese testified that he did not believe he was drunk. Griese claimed that when he argued with Trafton later that morning, Trafton threatened to burn the house down. Griese testified that he called 911, but when Officer Gice arrived to investigate, Griese decided to let his wife handle the situation and stayed in his room.

After Officer Gice left, Theresa Griese showed Griese an eviction notice that she had given to Trafton. Griese stated that he believed that the notice was ineffective and there was nothing they could do about Trafton. Griese testified that he was angry and frustrated, and grabbed four bottles of medication and "just dumped them down and washed them down with beer." He then planned to lie down and sleep.

Griese testified that he got up only after he thought he heard Trafton arguing with Theresa Griese. He picked up a knife and went downstairs. He claimed that he then heard a muffled scream. He testified that he rushed past Brian Bishop to the open bedroom door and observed Trafton and Bishop having sexual intercourse. Griese testified that he believed Bishop was pushing Trafton away and was not a willing participant in the intercourse. He testified that he pulled Trafton off Bishop and stabbed him "about five times" to protect himself. He explained Bishop's injuries by testifying, "Well, when Tom and I were struggling over the knife, somehow Sue got stabbed in the chest." He could not explain the additional 14 wounds to Bishop and contended that Bishop was still alive and the knife was not embedded in her back when he left the room.

I.

We first address Griese's contention that he was deprived of his due process right to present a defense by the district court's ruling limiting the testimony of Dr. Paul Reitman, a psychologist who met with Griese twice following the crimes. In addition to administering two psychological tests to Griese, Dr. Reitman reviewed police reports as well as the reports of a psychiatrist and

neuropsychologist who evaluated Griese's competency to stand trial. After the defense called upon Dr. Reitman to give his clinical diagnosis of Griese on the stand, the court sustained the prosecutor's objection that allowing Dr. Reitman to give such a diagnosis would be to allow inadmissible diminished capacity testimony. After further consideration, however, the court allowed Dr. Reitman to give a "basic clinical diagnosis" of Griese's condition. Dr. Reitman then testified that Griese suffered from major depressive disorder, alcohol dependence in remission, and possibly alcohol dementia. Griese contends that the district court erred in limiting further testimony from Dr. Reitman regarding the effects of Griese's depression, chronic alcoholism and ingestion of prescription drugs on his mental state at the time of the murders.[4]

■ The admission of expert opinion testimony typically rests within the discretion of the district court. *State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984). The general rule outlined by this court in *State v. Bouwman,* 328 N.W.2d 703, 705–06 (Minn.1982), is that expert psychiatric testimony on whether a defendant was capable of forming the requisite mens rea for the crime charged is admissible only in the second phase of a bifurcated trial when the defendant pleads not guilty by reason of insanity. *Id.; State v. Schreiber,* 558 N.W.2d 474, 478 (Minn. 1997). Because direct evidence of intent is rare, jurors must look to "what a defendant says and does" to determine whether a defendant acted with the requisite intent. *State v. Provost,* 490 N.W.2d 93, 98 (Minn. 1992), *cert. denied,* 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993). Like intent, premeditation is " 'subjective' and must be

inferred from 'the totality of the circumstances surrounding the crime.' " *State v. Brom,* 463 N.W.2d 758, 763 (Minn.1990) (citations omitted), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991).

■ Moreover, because most jurors have some experience with mental illness and intoxication, expert psychiatric testimony as to the effects of those conditions is also generally inadmissible. *Provost,* 490 N.W.2d at 103. Although expert testimony on a person's blood alcohol content and on the fact of intoxication is admissible, expert testimony on how this intoxication may have impaired a defendant's capacity to form specific intent is inadmissible diminished capacity testimony. *Id.* at 102.

■ Griese acknowledges that psychiatric opinion testimony calculated to demonstrate that a defendant did not have the capacity to premeditate the offense or form the requisite intent is generally inadmissible. However, he contends that such testimony should have been allowed in this case because the combination of mental illness and intoxication of a chronic alcoholic is beyond the experience of most jurors.

We reject Griese's argument that the facts of this case—including Griese's alcoholism, depression, and drug ingestion—render the average juror incapable of understanding his alleged condition, thus warranting a departure from the general rule. The rule against admissibility has been applied by this court and the court of appeals in cases involving not only alcohol intoxication, but also in cases involving drug ingestion and a defendant's mental illness. *See, e.g., State v. Jackman,* 396 N.W.2d 24, 25, 29 (Minn.1986); *State v. Brown,* 345 N.W.2d 233, 238 (Minn.1984);

---

4. Following Dr. Reitman's testimony, the defense made an offer of proof that if the court had not sustained the prosecutor's objection as to diminished capacity testimony, Dr. Reitman would have testified as to: (1) the interplay between chemical dependency and mental illness—that "it can affect judgment"; (2) the effects of alcohol intoxication and depression on a "person's ability to reason, their ability to plan and organize * * *"; (3) the effects of co-dependent relationships on "someone's behavior * * * [and] decision-making"; (4) the effects of a long period of sobriety on a person's tolerance for alcohol;

and (5) the effects of chronic alcohol intoxication in a chemically dependent person.

The prosecutor responded that he believed some of the defense's offer of proof would not have been excluded by the court's ruling. The court agreed, stating that the side bar discussion went only "to the prosecutor's objection to counsel eliciting information about Mr. Griese specifically." Defense counsel acknowledged that he may have misunderstood the court's ruling but asserted that he feared being admonished in front of the jury if he disobeyed what he perceived to be the court's directive.

*State v. Yates,* 392 N.W.2d 30, 31–32 (Minn. App.), *pet. for rev. denied* (Minn. Sept. 22, 1986).

■ Griese also argues that Dr. Reitman's testimony should have been admitted under an exception to the general rule alluded to by this court in *Provost.* In *Provost,* we stated that there "may be a few exceptions" to the general rule. 490 N.W.2d at 103. One instance in which expert psychiatric testimony "may be admissible is where the defendant has a past history of mental illness." *Id.* As we stated in *Provost,* "If the past history includes a clinical record wherein psychiatric opinions appear * * *, it may be that such evidence would be admissible * * * to explain 'the whole man' as he was *before* the events of the crime and before the miasma of after-the-crime rationalizations." *Id.* at 103–04 (emphasis added) (citation omitted).

Dr. Reitman's proposed testimony simply does not fall within the exception outlined in *Provost. See State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994) (concluding that the testimony of experts relying only on post-indictment records and evaluations of a defendant did not fall within the exception outlined in *Provost* ). Nowhere in Dr. Reitman's testimony or its offer of proof did defense counsel offer evidence of the prior diagnosis of Griese's mental illness or clinical records related to Griese's condition before the events of the crime. In fact, Dr. Reitman had not met Griese prior to the crimes and relied on the reports of doctors who also evaluated Griese only after the crimes. Because Dr. Reitman's testimony did not relate to "the whole man" as he was before the crimes, we conclude that the district court did not err in limiting Dr. Reitman's testimony.

## II.

Griese's next argument is that the prosecutor committed serious misconduct, denying him a fair trial, by improperly impeaching a defense witness as to the facts underlying the witness's criminal convictions and improperly disparaging the defense during closing argument.

Griese called psychiatrist Dr. Barry Garfinkel to testify regarding the effects of the drugs taken by Griese, as well as the effects of combining drugs and alcohol on human behavior. In an effort to impeach Dr. Garfinkel, the prosecutor questioned him about his conviction on felony charges in 1993. *See* Minn.Stat. § 595.07 (1996); Minn. R. Evid. 609. Dr. Garfinkel was convicted on five federal counts: two of mail fraud, and three of making false statements. Over defense objections, the prosecutor questioned Dr. Garfinkel on the nature of his convictions and elicited Dr. Garfinkel's testimony that the felony counts dealt with his role in drug research.

We have previously indicated that when a witness is the defendant in a criminal proceeding, cross-examination as to the witness's prior convictions may ordinarily extend only to the fact of conviction, the nature of the offense, and the identity of the defendant. *State v. Norgaard,* 272 Minn. 48, 51, 136 N.W.2d 628, 631 (1965). In such cases, there is a unique possibility of prejudice: to allow broad inquiry into the facts underlying a prior conviction might confuse the issues before the jury or have a chilling effect on the accused's right to testify in his own defense. *See id.* ("Under this statute [Minn.Stat. § 595.07] a defendant who takes the stand as a witness exposes himself to the hazard of being asked questions relating to prior convictions.").

■ As we stated in *Norgaard* and reaffirmed more recently in *State v. Brown,* 500 N.W.2d 784, 787–88 (Minn.1993), "the scope of such cross-examination must be left largely to the discretion of the [trial] court depending upon the circumstances." *Norgaard,* 272 Minn. at 51, 136 N.W.2d at 631. We believe this is particularly true when the witness is other than the accused and, as in this case, is an expert witness whose prior convictions relate directly to the substance of the witness's testimony. Accordingly, we conclude that the district court was within its discretion in allowing the prosecutor to further delve into the facts underlying the witness's convictions.

■ The more troubling charge is that the prosecutor committed serious misconduct during closing argument. We note that defense counsel failed to object to any

part of the prosecutor's closing argument. Ordinarily, a defendant waives his right to challenge a prosecutor's closing argument by failing to object or seek cautionary instructions. *Rairdon v. State,* 557 N.W.2d 318, 323–24 (Minn.1996); *State v. Atkins,* 543 N.W.2d 642, 647 (Minn.1996); *State v. Parker,* 353 N.W.2d 122, 127 (Minn.1984). However, a defendant may obtain appellate review of and relief from plain errors affecting substantial rights if those errors had the effect of depriving the defendant of a fair trial. *Rairdon,* 557 N.W.2d at 323; *State v. Williams,* 525 N.W.2d 538, 544 (Minn.1994); *State v. Post,* 512 N.W.2d 99, 103–04 (Minn. 1994); *see also* Minn. R.Crim. P. 31.02.

Griese argues that the prosecutor's closing argument improperly belittled Dr. Garfinkel and disparaged the defense. The prosecutor made the following remarks in closing argument:

Now, the defense has a dilemma. They've got all this testimony indicating that there's a serious question as to whether he [Griese] was even impaired, much less so drunk he can't form the intent.

*So what do they do? What do you do in a case like that?*

Well, you *scrounge up* a convicted federal felon doctor to come in and testify to some clinical studies which say that alcohol and medication create confusion. And they don't.

We had the clinical studies in the PDR [Physician's Desk Reference] book. We pulled them out. I confronted him with them.

What those studies indicate is that combining the medications with alcohol or overdose amounts can cause drowsiness.

And that is only in one half of one percent of the cases, and it depends upon how much.

Now, the doctor is telling you, "Well, it causes confusion, could impair a person in that regard."

Well, the studies don't say that. They say drowsiness.

And he basically admitted that, and it was him interpreting drowsiness to include confusion.

Now, if we didn't have that PDR book—and I'm no doctor, I'm no expert in pills; I just know what I read.

If I hadn't had that book and we didn't have it to confront the doctor, who would any of us have been to question him on the question of confusion?

And isn't it interesting that he's manipulating the results of those clinical studies, and it's coming from somebody who's been convicted on five separate felonies in Federal District Court for making false statements in relationship to drug research projects.

*That's what you do when you try to respond to testimony indicating he wasn't impaired.*

*What else do you do?*

You look for and you find a psychologist who is so arrogant that he implies that the average person on the street, the average juror, isn't competent to make determinations of who is intoxicated and who is not.

(Emphasis added).

 This court has repeatedly warned prosecutors that it is improper to disparage the defense in closing arguments or to suggest that a defense offered is some sort of standard defense offered by defendants "when nothing else will work." *Williams,* 525 N.W.2d at 548–49; *State v. Salitros,* 499 N.W.2d 815, 818–20 (Minn.1993); *see State v. Bettin,* 309 Minn. 578, 579, 244 N.W.2d 652, 654 (1976).

In *Williams,* the prosecutor used language similar to some of the language used by the prosecutor in this case:

Now what's the defense in this case? *What kind of defense could you raise in a drug case?* Well, okay, one possible defense would be, well, it's not drugs. *That's not going to work in this case is it?* * * *.

Now the defense may be—well, it might be cocaine, but it's not the appropriate amount of cocaine for the crime with which I'm charged. *That doesn't work either.* * * *.

*What might work?* Okay. So there was cocaine in my bag, but I didn't put it there

and I don't know how it could have gotten there.

*Williams,* 525 N.W.2d at 548–49 (emphasis added).

We concluded that this argument was prosecutorial misconduct because it "improperly invited the jurors to speculate with respect to the motivation behind defendant's decision to try the case as she did" and was similar to the "[t]hat's the sort of defense that defendants raise when nothing else will work" argument declared improper in prior cases of this court. *Id.* at 549 (citations omitted). As we stated in *Williams,* "The prosecutor in this case was fully free to specifically argue that there was no merit to the defense * * * but she was not free to belittle the defense * * * in the abstract or, as here, to suggest that the defendant raised it because that was the only defense that 'might work.'" *Id.*

Similarly, in *Salitros* this court exercised its supervisory powers to act in the interests of justice in reversing a case prosecuted by the same prosecutor as in this case for making a similar argument even in the absence of evidence that the argument was prejudicial. 499 N.W.2d at 818–20. In *Salitros,* the prosecutor suggested that the defense was employing a "real common defense tactic that is used over and over in criminal trials." *Id.* at 818. He also contended that defense attorneys commonly "throw in the kitchen sink" in order to distract juries from the guilt of their clients. *Id.* at 819.

Defense counsel argues that Griese's conviction, like the conviction of the defendant in *Salitros,* must be reversed in the interests of justice. The improper argument in *Salitros* was, however, considerably more egregious than the argument in this case. In *Salitros,* in addition to disparaging the defense, the prosecutor also repeated almost verbatim an "accountability" argument previously criticized by this court in *State v. Montjoy,* 366 N.W.2d 103, 108–09 (Minn.1985), and, more importantly, suggested that constitutional rights "have never been designed to serve as a shield for the guilty to hide behind." *Salitros,* 499 N.W.2d at 819. In addition, unlike *State v. Porter,* 526 N.W.2d 359 (Minn.1995), in which we reversed the defendant's conviction on the basis of improper argument, the misconduct in closing argument in this case was limited to a little more than two pages in a more than 50–page closing argument and cannot be said to have "permeated the entire closing argument." *Id.* at 365.

■ We are troubled that a prosecutor once-reversed by this court would risk reversal a second time by offering even a brief—albeit less egregious—reprise of the improper argument in a subsequent case. Despite our strong distaste for such tactics, however, we must conclude that any improper conduct by the prosecutor was not so prejudicial that Griese was denied a fair trial. Failure to object or to seek a curative instruction weighs heavily against granting the remedy of a new trial. *Rairdon,* 557 N.W.2d at 324. Not only was the evidence of guilt overwhelming, but also there was scant evidence supporting the defense theory that Griese was so impaired by alcohol and drugs as to be unable to premeditate the crimes. *See id.* at 324–25 (emphasizing powerful evidence of guilt, including multiple confessions, in concluding that the defendant was not denied a fair trial despite potentially improper argument by the prosecutor). Even had the jury fully credited Dr. Garfinkel's testimony, the jury was still required to determine whether or not Griese premeditated the murders not on the basis of expert testimony, but rather by the totality of the circumstances, including what Griese said and did on the day of the killings. *See Provost,* 490 N.W.2d at 98–99; *Brom,* 463 N.W.2d at 763. We therefore conclude that Griese's allegations of prosecutorial misconduct are insufficient to warrant a new trial. *See Atkins,* 543 N.W.2d at 647–48 (noting that prosecutorial misconduct does not in and of itself require that the defendant be granted a new trial; the test is whether the defendant received a fair trial); *State v. Merrill,* 428 N.W.2d 361, 372–73 (Minn.1988).

## III.

■ Griese next contends that the district court erred in dismissing the second-degree murder counts included in the grand jury indictment. During oral argument before this court, the state public defender

argued that dismissing the second-degree counts on the day in which jury selection was to begin, equated to a "sharp practice" which deprived Griese of a fair trial. However, even assuming for purposes of argument that the district court erred in dismissing the second-degree counts, we fail to see how their dismissal deprived Griese of a fair trial or otherwise prejudiced his case. The theory of the defense case, from opening argument until the moment the jury received the case, was unmistakably that Griese did not premeditate the murders. Moreover, the jury was fully instructed both on second-degree murder without premeditation and on second-degree murder-unintentional while committing a felony, in addition to the first-degree murder charge. We therefore conclude that the dismissal of the second-degree counts did not deprive Griese of a fair trial and is insufficient grounds to warrant a new trial.

### IV.

Griese's final argument is that the evidence was insufficient as a matter of law to support the first-degree murder convictions. He argues that the killings of Trafton and Bishop were not premeditated, but instead were prefaced by the "[u]nconsidered, rash, impulse to kill."

In reviewing a sufficiency of the evidence claim, this court is limited to determining whether a jury could reasonably conclude that the defendant was guilty of the charged offense. *Atkins*, 543 N.W.2d at 646. This court does not retry the facts, but instead considers the evidence in the light most favorable to the jury's verdict and assumes the jury believed the state's witnesses and disbelieved any evidence to the contrary. *Id.* The verdict will be upheld if the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty of the offense charged. *Id.*

Minnesota law defines premeditation as to "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18. A finding of premeditation does not require a showing of extensive planning, but rather requires only that some appreciable time pass between the formulation of the intent to kill and the act of killing itself. *State v. Netland*, 535 N.W.2d 328, 330 (Minn.1995). No specific period of time for premeditation is required. *State v. Moore*, 481 N.W.2d 355, 361 (Minn.1992).

We conclude that there was ample evidence of premeditation to support the jury verdict. First, there was strong evidence of motive. Evidence presented at trial indicated that Griese hated Trafton and was incensed over Trafton's drinking and failure to pay rent. Griese made three 911 calls to police in the 24 hours preceding the murders, in an unsuccessful effort to have Trafton removed from the house, possibly suggesting a motive for the killings. As this court stated in *Moore*, "While proof of a motive is not a necessary element of premeditated murder, presence of a motive strengthens a finding that [a] defendant deliberated over his actions and weakens the argument that the killing was spontaneous." *Id.* at 362.

Next, the totality of the circumstances before, during and after the murders strongly support a finding of premeditation. *See State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995); *Moore*, 481 N.W.2d at 361. The jury could reasonably have concluded from the evidence that Griese walked from his bedroom to the kitchen and retrieved the knife used as the murder weapon; met his wife on his way downstairs and told her to go to their son John's and either that "he was going to kill them" or "going to kill Tom"; then walked down the stairs to the bedroom directly under his own, attacked the victims while they were in a vulnerable position, and brutally murdered them. *See Netland*, 535 N.W.2d at 329–30 (concluding with "no hesitancy" that there was sufficient evidence of premeditation when defendant took knives from the victims' kitchen, walked to the victims' bedroom and stabbed them); *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979) (upholding jury's finding of premeditation when the crime required the defendant to "procure the rifle from its location in the house, walk down the hallway to the [vic-

tims'] bedroom, raise the rifle, take careful aim, and pull the trigger three times"); *see also State v. McCullum,* 289 N.W.2d 89, 92 (Minn.1979) (stating that the brutality of a killing may be considered by the jury as supporting premeditation).

Finally, we note that after killing the victims, Griese told Michelle Bishop what he had done and ordered her to go to her room. He then calmly telephoned 911 and told the operator that he had killed the victims.

 The fact that a defendant consumed intoxicants prior to an offense does not raise a presumption that the defendant was incapable of premeditation. *State v. Pilcher,* 472 N.W.2d 327, 335 (Minn.1991). Rather, the burden is on the defendant to prove by a preponderance of the evidence that he was so intoxicated as to be incapable of forming the required premeditation. *See State v. Buchanan,* 431 N.W.2d 542, 549 (Minn.1988); 10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 7.03 (3d ed.1990). The jury obviously rejected Griese's claim of intoxication in returning dual verdicts of guilty of first-degree murder. The evidence, including Gary Irwin's testimony that Griese said he did not take the drugs until after the murders and Griese's own testimony that he did not believe he was drunk on the morning of the murders, amply supported the jury's conclusion.

Affirmed.

TOMLJANOVICH, Justice (dissenting):

I respectfully dissent. Under the facts of this case, I believe the district court's dismissal of the two second-degree murder counts from the multi-count indictment that also charged the defendant with two counts of first-degree murder prejudiced the substantial rights of the defendant. Because the error interfered with the integrity of the grand jury, I would reverse the convictions.

The grand jury has a significant and historic role in American justice. The basis of its function "was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused * * * ." *Hale v. Henkel,* 201 U.S. 43, 59, 26 S.Ct. 370, 373, 50 L.Ed. 652 (1906).

A prosecutor seeking to prosecute a suspect on a charge of first-degree murder must submit the matter to the grand jury. Minn. R.Crim. P. 17.01. Acting pursuant to Minn. R.Crim. P. 18.07, the grand jury, in the independent exercise of its traditional role, concluded there was probable cause to charge the defendant with two counts of first-degree murder as well as with two counts of the lesser offense of second-degree murder.

The majority assumes for purposes of argument that it was error for the district court to dismiss the two second-degree murder counts, concluding that if there was error it was not prejudicial.

I do not agree. The district court exceeded its authority in dismissing the two counts of second-degree murder without a sufficient fact basis. The dismissal interfered with the independence of the grand jury. In the absence of a grand jury indictment it would be within the discretion of the prosecutor to dismiss the charge without leave of the court. Minn. R.Crim. P. 30.01.

However, a somewhat different standard has developed in those cases commencing upon the return of an indictment by the independently functioning grand jury. In that event, the grand jury has concluded that there exists probable cause that an offense has been committed and that the defendant committed it. The prosecutor then must make a careful analysis based upon his independent evaluation of the circumstances and the experience of his office. His decision to dismiss the indictment is therefore to be founded upon that careful exercise of discretion with due regard for the interests of the public as well as those of the defendant. The obvious intent of that portion of Rule 30.01, * * * requiring an adequate record and judicial scrutiny prior to dismissal with leave of the court is merely to facilitate the court's satisfaction that the prosecutor has neither summarily ignored nor preempted the considered decision of the grand jury without a sufficient factual basis.

*State v. Aubol,* 309 Minn. 323, 329, 244 N.W.2d 636, 640 (1976) (citations omitted).

In this case it appears that the prosecutor sought to dismiss simply because he wished to prosecute the case as two first-degree murders and gained a tactical advantage by dismissal of the two second-degree murder counts included in the indictment. The jury was informed at the outset of the trial that the grand jury had indicted the defendant only on two counts of first-degree murder. In the opening statement the defense was not at liberty to point out that the grand jury also had indicted on two counts of second-degree murder. We previously have expressed our concern that the grand jury not be seen as a tool of the prosecutor. "There is a tendency for prosecutors to view the grand jury as a tool for their convenience." *State v. Johnson,* 441 N.W.2d 460, 462 (Minn. 1989). It appears that in this case there was not a careful analysis of the circumstances in deciding to seek dismissal, but simply a conclusion that it would be easier to prosecute the case without the jury having been informed that the grand jury also had returned second-degree murder indictments. That is not an adequate reason for dismissal.

As we stated in *Johnson:*

> The grand jury is not intended to be a tool of the prosecution or the defense. It is an arm of the judiciary and, as such, it shall be used in a fair, impartial and independent manner or not at all.

441 N.W.2d at 466.

I cannot agree with the majority that an after-the-fact submission to the jury of two forms of second-degree murder cured the error.

I would reverse.